# IN THE SUPREME COURT OF IOWA

No. 05 / 06–1002

Filed July 11, 2008

**THE PILLSBURY COMPANY INC.,**

      Appellant,

vs.

**WELLS DAIRY, INC.,**

      Appellee.

--------------------------------------------------------------------------------------------

WELLS DAIRY, INC.,
      Third-Party Plaintiff,

vs.

AMERICAN INDUSTRIAL
REFRIGERATION, INC. and
REFRIGERATION VALVES and
SYSTEMS CORPORATION,
      Third-Party Defendants.

---

Appeal from the Iowa District Court for Plymouth County, James D. Scott, Judge.

Appellant appeals the district court's granting of appellee's motions for summary judgment. **REVERSED AND CASE REMANDED**.

Mark McCormick and Margaret C. Callahan of Belin Lamson McCormick Zumbach Flynn, P.C., Des Moines, William J. Cremer, Edmund J. Siegert, and Bradley M. Burd of Cremer, Kopon, Shaughnessy & Spina, LLC, Chicago, Illinois, and Daniel L. Hartnett and

Marci L. Iseminger of Crary, Huff, Inkster, Sheehan, Ringgenberg, Hartnett & Storm, P.C., Sioux City, for appellant.

Juli Wilson Marshall, Mary Rose Alexander, Thomas J. Heiden, André M. Geverola, and Matthew J. Johnson of Latham & Watkins, LLP, Chicago, Illinois, Richard H. Moeller of Berenstein, Moore, Berenstein, Heffernan & Moeller, L.L.P., Sioux City, and Bruce Johnson of Cutler Law Firm, P.C., West Des Moines, for appellee.

**WIGGINS**, **Justice**.

The Pillsbury Company, Inc. appeals a district court ruling granting Wells Dairy Inc.'s motion for summary judgment dismissing Pillsbury's action on the grounds that Pillsbury was not the real party in interest and the force-majeure clause in the parties' production contract relieved Wells of performance. On our review of the record, we find that genuine issues of material fact exist as to whether Pillsbury is the real party in interest and that as a matter of law, under the production contract a force-majeure event must be beyond the reasonable control of Wells. Therefore, we reverse the district court judgment in favor of Wells and remand the case for further proceedings.

## I. Background Facts and Proceedings.

On or about January 28, 1999, Pillsbury entered into a production contract with Wells for the production of Häagen-Dazs ice cream. On March 27 there was an explosion at Wells' south ice cream manufacturing facility in Le Mars. On August 18 Pillsbury entered into a Contribution and Assumption Agreement with Nestlé-USA Food Group, Inc. to form a joint venture called Ice Cream Partners USA, LLC (ICP). This agreement reflected the parties' intention to combine Nestlé's ice cream division assets and Pillsbury's Häagen-Dazs division assets. Pillsbury sent Wells a notice of assignment on October 20. In the notice, Pillsbury informed Wells that

> the assignment is not, nor shall it be deemed to be, a waiver, release, or renunciation by Pillsbury, or by any of its agents or assignees, of any claims, rights or remedies of Pillsbury relating in any way to the explosion that occurred at the Wells facility in Le Mars, Iowa in March 1999 and all subsequent events . . . .

On July 17, 2000, Pillsbury filed a two-count petition against Wells in federal court under the name of its parent company, Diageo, PLC,

requesting damages resulting from the explosion on theories of breach of contract and negligence. On August 30 Pillsbury filed an amended petition substituting itself as the plaintiff.

Wells filed an action in state court against various entities involved in the design and installation of its refrigeration system implicated in the explosion. Pillsbury agreed to voluntarily dismiss its federal suit so it could consolidate its action with Wells' pending state court action against the manufacturers of Wells' refrigeration system. On August 8, 2002, Pillsbury filed its two-count petition against Wells in state court alleging its breach of contract and negligence claims. On October 14 Wells answered Pillsbury's state court petition and raised the "force-majeure" clause of the production contract as an affirmative defense.

In December 2001 Nestlé acquired the fifty percent interest in ICP originally owned by Pillsbury and renamed the former joint venture NICC. In an agreement between Nestlé and Dreyer's Grand Ice Cream, Dreyer's acquired the assets relinquished by Pillsbury under the 1999 contribution agreement that formed ICP with Nestlé.

Over the course of the proceedings, the district court ruled on three motions for summary judgment. On May 29, 2003, Wells filed its first motion for summary judgment arguing the force-majeure clause contained in the 1999 production contract between Wells and Pillsbury excused Wells' inability to perform. In ruling on this motion the court held the force-majeure clause was susceptible to more than one interpretation and ordered the discovery of extrinsic evidence on the issue.

After the parties completed their discovery on the issue, Wells filed a second motion for summary judgment. Again, Wells argued the force-majeure clause excused Wells' inability to perform. Finally, Wells filed a

third motion for summary judgment arguing Pillsbury had no standing to assert its claims against Wells because it had assigned its interest in the cause of action to ICP.

The court found the force-majeure clause relieved Wells from performing under the production contract and sustained Wells' second motion for summary judgment on this ground. The district court dropped Wells' standing argument and treated it as an argument that Pillsbury was not the real party in interest to pursue the action against Wells. The district court sustained Wells' motion by holding Pillsbury was not the real party in interest because it had assigned its interest in the cause of action against Wells to ICP. Accordingly, the district court gave Pillsbury two weeks to join or substitute the real party in interest or the court would dismiss the lawsuit.

Pillsbury attempted to comply with the court's order by substituting Zurich, its insurer, as the plaintiff. Wells resisted the attempt to allow Zurich to proceed with the action. The court sustained Wells' resistance, dismissed the action, and entered judgment in favor of Wells.

Pillsbury appeals. We will set out additional facts as they relate to the issues.

**II.  Issues.**

In this appeal, we must decide if the district court correctly determined Pillsbury is not a proper party to the action and if the force-majeure clause of the Wells/Pillsbury production contract relieved Wells from performing under the contract.

**III.  Scope of Review.**

We review a district court's ruling on a motion for summary judgment for correction of errors at law. *Kragnes v. City of Des Moines,*

714 N.W.2d 632, 637 (Iowa 2006). Summary judgment is appropriate only if the record shows there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Iowa R. Civ. P. 1.981. The appellate court's review is therefore limited to whether a genuine issue of material fact exists and whether the district court correctly applied the law. *City of Cedar Rapids v. James Props., Inc.*, 701 N.W.2d 673, 675 (Iowa 2005).

The burden of showing the nonexistence of a material fact is upon the moving party. *Clinkscales v. Nelson Sec. Inc.*, 697 N.W.2d 836, 841 (Iowa 2005). Every legitimate inference that can be reasonably deduced from the evidence should be afforded to the nonmoving party, and a fact question is generated if reasonable minds can differ on how the issue should be resolved. *Kragnes*, 714 N.W.2d at 637.

## IV. Proper Party.

**A. Real Party in Interest Versus Standing.** Wells' motion for summary judgment claimed Pillsbury had no standing to assert its claims against Wells because it had assigned its interest in the cause of action to ICP. The district court analyzed the issue as one of real party in interest. A party who has standing and the real party in interest are not one in the same.

Our court has not commented on the difference between standing and real party in interest, but several other courts have. For instance, the Supreme Court of Alabama explained the difference as follows:

> We use the term "real party in interest," rather than "standing," for a reason. Although both parties and the trial court have blurred the issue by referring to [the plaintiff's] "standing," the question whether a party has *standing to sue* is distinct from whether he or she is the *real party in interest.* While the real-party-in-interest principle directs attention to whether the plaintiff has a significant interest in the particular action he or she has instituted, standing requires

that the person demonstrate an injury to a legally protected right. Here, [the plaintiff] has standing to sue because [the defendant's] alleged breach of contract injured *her*, not the bankruptcy trustee.

*Ex Parte Sterilite Corp. of Alabama v. Sterilite Corp. of Alabama*, 837 So. 2d 815, 818–19 (Ala. 2002) (internal citations omitted) (emphasis in original). In *Sterilite*, the court never reached the issue of whether the plaintiff was the real party in interest because the defendant failed to object on those grounds. *Id.* at 819. However, in other cases, courts have held that simply because a party has standing, does not mean he or she is the real party in interest and vice versa. *See, e.g., Hammes v. Brumley*, 659 N.E.2d 1021, 1029–30 (Ind. 1995).

In *Hammes*, the Indiana Supreme Court explained the difference between standing and real party in interest as follows:

Standing refers to the question of whether a party has an actual demonstrable injury for purposes of a lawsuit. . . .

"In order to invoke a court's jurisdiction, a plaintiff must demonstrate a personal stake in the outcome of the lawsuit and must show that he or she has sustained or was in immediate danger of sustaining, some direct injury as a result of the conduct at issue."

A real party in interest, on the other hand, is the person who is the true owner of the right sought to be enforced.

*Id.* (quoting *Higgins v. Hale*, 476 N.E.2d 95, 101 (Ind. 1985). The court went on to hold that the bankrupt parties were not the real parties in interest, rather the trustees of their respective bankruptcy estates were. *Id.* at 1030. However, even though the parties were not the real parties in interest, they still had standing to sue because they suffered a demonstrable injury allegedly caused by the parties they were suing. *Id.* Because the parties had standing to sue, but were not the real parties in interest, the court found the bankrupt parties should be allowed to

amend their petition to include the bankruptcy trustees, who were the real parties in interest, and the amended petition should relate back to the original filing date. *Id.*

When there is an effective assignment, "the assignee assumes the rights, remedies, and benefits of the assignor," *Red Giant Oil Co. v. Lawlor*, 528 N.W.2d 524, 533 (Iowa 1995), and the assignment transfers the "entire rights under a contract from the assignor to the assignee so that the assignee assumes not only the benefits of the contract, *but also the rights and remedies*," *Ross v. First Savings Bank of Arlington*, 675 N.W.2d 812, 817 (Iowa 2004) (emphasis added). Our rules require "[e]very action must be prosecuted in the name of the real party in interest." Iowa R. Civ. P. 1.201. Therefore, the district court was correct to analyze the motion as a real party in interest question rather than a standing question because Wells claims Pillsbury assigned this cause of action to ICP and no longer owned it.

**B. Choice of Law.** The parties cite only Iowa law on the issue of whether Pillsbury was the proper party to maintain this action. We will not disagree with the parties that Iowa law applies in this case to determine who may and must be the proper party to bring the claim. *See* Restatement (Second) of Conflicts § 125 (1971) (stating "[t]he local law of the forum determines who may and who must be parties to a proceeding unless the substantial rights and duties of the parties would be affected by the determination of this issue").

Wells argues Pillsbury is not a proper party because it assigned its rights to this cause of action to ICP in the Contribution and Assumption Agreement. Thus, the determination as to whether Pillsbury was a proper party requires us to interpret the Contribution and Assumption Agreement. The choice of law provision in the Contribution and

Assumption Agreement provides the laws of the state of New York shall govern the interpretation of the agreement. However, neither party has pled or proved New York law on this issue. Accordingly, we will assume New York law is the same as Iowa law, and we will apply Iowa law to the interpretation of the Contribution and Assumption Agreement. *EFCO Corp. v. Norman Highway Constructors, Inc.*, 606 N.W.2d 297, 300 (Iowa 2000).

**C. Contract Interpretation—Iowa Law.** In deciding the issues before us, we are required to apply the principles of contract interpretation, rather than contract construction. Interpretation is the process for determining the meaning of the words used by the parties in a contract. *Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp.*, 266 N.W.2d 22, 25 (Iowa 1978). Interpretation of a contract is a legal issue unless the interpretation of the contract depends on extrinsic evidence. *Id.* On the other hand, construction of a contract is the process a court uses to determine the legal effect of the words used. *Id.* We always review the construction of a contract as a legal issue. *Id.*

The cardinal rule of contract interpretation is to determine what the intent of the parties was at the time they entered into the contract. *Walsh v. Nelson*, 622 N.W.2d 499, 503 (Iowa 2001). "Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight." *Fausel v. JRJ Enters., Inc.*, 603 N.W.2d 612, 618 (Iowa 1999) (quoting Restatement (Second) of Contracts § 202(1) (1979)). Another relevant rule of contract interpretation requires that "[w]**herever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant**

**course of performance, course of dealing, or usage of trade."** Restatement (Second) of Contracts § 202(5) (1979).

These rules of interpretation are general in character and only serve as guides in the process of interpretation. Restatement (Second) of Contracts § 202 cmt. a (1979). The rules do not depend on a determination that there is an ambiguity, but we use them to determine "what meanings are reasonably possible as well as in choosing among possible meanings." *Fausel*, 603 N.W.2d at 618 (quoting Restatement (Second) of Contracts § 202 cmt. a (1979)).

Long ago we abandoned the rule that extrinsic evidence cannot change the plain meaning of a contract. *Hamilton v. Wosepka*, 261 Iowa 299, 313, 154 N.W.2d 164, 171–72 (1967). We now recognize the rule in the Restatement (Second) of Contracts that states the meaning of a contract "can almost never be plain except in a context." *Id.*; Restatement (Second) of Contracts § 212 cmt. b (1979). Accordingly,

> "[a]ny determination of meaning or ambiguity should only be made in the light of relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties. *But after the transaction has been shown in all its length and breadth, the words of an integrated agreement remain the most important evidence of intention.*"

*Fausel*, 603 N.W.2d at 618 (quoting Restatement (Second) of Contracts § 212 cmt. b (1979)) (emphasis in original).

In other words, although we allow extrinsic evidence to aid in the process of interpretation, the words of the agreement are still the most important evidence of the party's intentions at the time they entered into the contract. When the interpretation of a contract depends on the credibility of extrinsic evidence or on a choice among reasonable

inferences that can be drawn from the extrinsic evidence, the question of interpretation is determined by the finder of fact.

**D. Analysis.** We must analyze the relevant portions of the Contribution and Assumption Agreement that formed ICP to determine whether Wells properly asserts Pillsbury is not a proper party because Pillsbury assigned its interest in this action to ICP. Applying the principles of interpretation to the relevant provisions of the contract, we are convinced a genuine issue of material fact exists as to whether Pillsbury assigned its interest in this action and therefore, whether it is the real party in interest. The language used by the parties to the Contribution and Assumption Agreement is unclear as to whether the cause of action relating to the explosion at Wells was assigned; thus, a reasonable juror could find the intent of the agreement was not to assign the present cause of action to ICP.

Paragraph 2.01(b) of the agreement purports to transfer the assets of Pillsbury's Häagen-Dazs business to ICP by providing:

> (b) Pillsbury shall convey, transfer, assign and deliver to the Joint Venture on the Closing Date, and the Joint Venture shall accept from Pillsbury, free and clear of all Liens, other than Permitted Liens, all of Pillsbury's (or, if applicable, its Affiliates') right, title and interest in the assets used or reserved for use in the operation of the Häagen-Dazs Business, except to the extent included in the Excluded Pillsbury Assets (collectively, the "Häagen-Dazs Assets" and, together with the Nestlé Ice Cream Division Assets, the "Contributed Assets"), including, without limitation, all of Pillsbury's (or, if applicable, its Affiliates') right, title and interest in the following assets that are used or reserved for use in the Häagen-Dazs Business.

Three separate paragraphs purport to assign the Häagen-Dazs contracts, the causes of action relating to insurance coverage, and the causes of action relating to the Häagen-Dazs business. Paragraph 2.01(b)(2) purports to assign the Häagen-Dazs contracts to ICP.

Paragraph 2.01(b)(8) purports to assign the causes of action against third parties relating to insurance coverage involving the Häagen-Dazs business by providing:

> (8)    All of Pillsbury's rights, claims, credits, causes of action or rights of setoff against third parties relating to insurance coverage covering the Häagen-Dazs Business with respect to events occurring or claims arising prior to the Closing Date, but only to the extent such coverage and any proceeds therefrom covers (i) any of the Assumed Liabilities, (ii) any pre-Closing liabilities or obligations of the Häagen-Dazs Business to which the Joint Venture becomes subject notwithstanding the provisions of this Agreement, and (iii) subject to Section 9.07, lost profits claimed (which claim shall not duplicate or be inconsistent with the insurance claim made by Pillsbury prior to the date hereof relating to the Wells Facility Disruption (which, as of the date hereof, seeks recovery for increased costs and lost profits for pre-Closing periods and future marketing and promotional expenses in lieu of amounts that could be available as recovery for lost profits with respect to post-Closing periods)) after the Closing Date relating to any period beginning after the Closing in connection with the Wells' Facility Disruption.

Paragraph 2.01(b)(9) of the agreement purports to assign all causes of action relating to the Häagen-Dazs business except those that related to the excluded Pillsbury assets or the excluded Pillsbury liabilities by providing:

> (9)    All of Pillsbury's rights, claims, credits, causes of action or rights of setoff against third parties relating to the Häagen-Dazs Business, whether liquidated or unliquidated, fixed or contingent, including claims pursuant to all warranties, representations and guaranties made by suppliers, manufacturers, contractors and other third parties in connection with products or services purchased by or furnished to Pillsbury in connection with the Häagen-Dazs Business and affecting any of the Häagen-Dazs Assets, but excluding any such rights, claims, credits, causes of action or rights of setoff to the extent they relate to the Excluded Pillsbury Assets or the Pillsbury Excluded Liabilities.

The excluded assets mentioned in paragraph 2.01(b)(9) that are relevant to this appeal are found in paragraph 2.02(b) of the agreement. That paragraph provides:

> Pillsbury and its Affiliates shall not contribute any of its right, title or interest in . . . (xiv) all of Pillsbury's rights, claims, credits, causes of action or rights of setoff against third parties relating to insurance coverage covering the Häagen-Dazs Business with respect to events occurring or claims arising prior to the Closing Date (including, without limitation, the Wells Facility Disruption and the insurance receivables relating thereto), except to the extent included in the Häagen-Dazs Assets pursuant to Section 2.01(b)(8). . . .

Paragraph 2.02(b)(xiv) excluded all of Pillsbury's causes of action against third parties relating to insurance coverage of the Häagen-Dazs business with respect to the events occurring or claims arising prior to the closing date. This paragraph explicitly states: "including, without limitation, the Wells Facility Disruption and the insurance receivables relating thereto." A reasonable jury could find this limitation was intended to exclude two separate items—the claim against Wells for the facility disruption and the insurance receivables related to the facility disruptions.

Further evidence contained in the Contribution and Assumption Agreement that would allow a jury to find the agreement treated the cause of action relating to the Wells facility disruption separately from the Häagen-Dazs contracts assigned in paragraph 2.01(b)(2) can be found in the notes to the financial statement attached to the agreement. The financial statement purports to list the value of the assets and liabilities contributed by Pillsbury to ICP. Note seven of the statement provides:

(7)     Miscellaneous Income

Miscellaneous income includes . . . accrued insurance refund for lost sales through June 30, 1999, resulting from the Wells Facility Disruption as described in the Agreements. In accordance with the Agreements, the Statement of Current Assets and Current Liabilities excludes all current assets and current liabilities related to the Wells' Facility Disruption.

A jury could interpret note seven to mean the Wells facility disruption claim is to be treated differently than any other asset being assigned to ICP. Thus, the language contained in the Contribution and Assumption Agreement is not clear as to whether Pillsbury intended to assign its cause of action against Wells to ICP.

Finally, the course of dealings of the parties to the Contribution and Assumption Agreement could also allow a reasonable jury to find Pillsbury did not intend to assign the present cause of action to ICP. Shortly after Pillsbury entered into the Contribution and Assumption Agreement it gave notice to Wells that it assigned all its interest in the production contract between them to ICP. Pillsbury also gave this notice to Nestlé, the other party to the agreement, and to ICP, the entity created by the agreement. In that notice Pillsbury stated it was not assigning "any claims, rights or remedies of Pillsbury relating in any way to the explosion that occurred at the Wells facility in Le Mars, Iowa in March 1999." *See Miller v. Geerlings*, 256 Iowa 569, 579, 128 N.W.2d 207, 213 (1964) (holding the court will adopt the practical construction placed upon a contract by the parties); *see also* Restatement (Second) of Contracts § 212 cmt. b. (1979) (stating relevant evidence includes the course of dealings between the parties).

Therefore, when viewing the evidence in a light most favorable to the nonmoving party, we find a genuine issue of material fact exists as to whether Pillsbury assigned its interest in the present action to ICP.

**V. Force Majeure.**

**A. Choice of Law.** The production contract between Wells and Pillsbury states, "[t]his Agreement and all actions relating hereto will be governed by the laws of the State of Minnesota." The parties agree that Minnesota law applies to the interpretation of the force-majeure clause in the production contract. They argued this issue as though they pled and proved Minnesota law. The district court in its ruling cited Minnesota law to decide this issue. On appeal, the parties argue this issue by relying on Minnesota law. Therefore, we will apply Minnesota law to the interpretation of the force-majeure clause contained in the production contract.

**B. Contract Interpretation—Minnesota Law.** Interpreting a contract under Minnesota law requires the court to determine and enforce the intent of the parties. *Motorsports Racing Plus, Inc., v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003). When interpreting a written contract, the court determines the intent of the parties from the plain language of the instrument itself. *Metro. Sports Facilities Comm'n v. General Mills Inc.*, 470 N.W.2d 118, 123 (Minn. 1991). When a contractual provision is clear and unambiguous, courts should not rewrite, modify, or limit its effect by a strained construction. *Telex Corp. v. Data Prods. Corp.*, 135 N.W.2d 681, 686–87 (Minn. 1965); *Anderson v. Twin City Rapid Transit Co.*, 84 N.W.2d 593, 601 (Minn. 1957); *Grimes v. Toensing*, 277 N.W. 236, 238 (Minn. 1938).

Whether a contract is ambiguous is a question of law to be determined by the court. *Noreen v. Park Constr. Co.*, 96 N.W.2d 33, 36 (Minn. 1959). A contract that is reasonably susceptible to more than one interpretation is ambiguous. *Employers Liab. Assurance Corp. v. Morse*, 111 N.W.2d 620, 624 (Minn. 1961). If the court finds that no ambiguity

exists, contract interpretation and its legal effect are questions of law for the court. *Bell Lumber Co. v. Seaman*, 161 N.W. 383, 384–85 (Minn. 1917). However, where the language is ambiguous, extrinsic evidence may be used to aid in the interpretation of the contract. *Blattner v. Forster*, 322 N.W.2d 319, 321 (Minn. 1982). In doing so, the court looks to the circumstances surrounding the making of the contract and to the parties' own subsequent interpretation of the agreement. *Fredrich v. Indep. Sch. Dist. No. 720*, 465 N.W.2d 692, 695 (Minn. Ct. App. 1991). This extrinsic evidence can be gleaned from the parties' course of dealings to aid in the interpretation of the contract. *Anoka-Hennepin Educ. Ass'n v. Anoka-Hennepin Indep. Sch. Dist. No. 11*, 305 N.W.2d 326, 330 (Minn. 1981). If extrinsic evidence is used, the interpretation of the contract is a question of fact for the jury unless such evidence is conclusive. *Donnay v. Boulware*, 144 N.W.2d 711, 716 (Minn. 1966).

**C. The Force-Majeure Clause.** The production contract between Wells and Pillsbury contained a force-majeure clause. The language of the clause relevant to this appeal states:

> FORCE MAJEURE: Neither party will be liable for delays or suspension of performance (other than the obligation to pay for services and goods sold and delivered) caused by acts of God or governmental authority, strikes, accidents, explosions, floods, fires or the total loss of manufacturing facilities or any other cause that is beyond the reasonable control of that party ("Force Majeure") so long as that party has used its best efforts to perform despite such Force Majeure.

**D. Analysis.** The district court found that the force-majeure clause is ambiguous because it is reasonably susceptible to more than one interpretation. It concluded the placement of the phrase "that is beyond the reasonable control of that party" creates the ambiguity. The district court held one reasonable interpretation of the force-majeure

clause is that this phrase modifies "acts of God or governmental authority, strikes, accidents, explosions, floods, fires or the total loss of manufacturing facilities or any other cause." Under this interpretation, the explosion and fire at the south ice cream manufacturing facility would not excuse Wells' nonperformance under the contract if the explosion and fire were not beyond the reasonable control of Wells.

The district court found another reasonable interpretation of the force-majeure clause is that this phrase only applies to "any other cause." Under this interpretation, the explosion and fire at the south ice cream manufacturing facility excuse Wells' performance under the contract even if the explosion and fire were within the reasonable control of Wells.

The determination of whether the language of a contract is ambiguous is ordinarily one of law for the court. *Noreen*, 96 N.W.2d at 36. We understand how the district court came to the conclusion that the placement of the phrase "that is beyond the reasonable control of that party," can make the force-majeure clause reasonably susceptible to two meanings, if the district court examined the force-majeure clause out of context with the entire agreement. However, when a court is required to make a determination of whether a clause is ambiguous, the words and phrases of sentences cannot be read in isolation. *Metro Office Parks Co. v. Control Data Corp.*, 205 N.W.2d 121, 124 (Minn. 1973). The determination of whether "an agreement is ambiguous must be reached through a process of synthesis in which words, phrases, and sentences are assigned a meaning in accordance with the apparent purpose of the agreement as a whole." *Id.*

Applying these principals to the force-majeure clause, we disagree with the district court and find the force-majeure clause is not

ambiguous. "Force majeure" is "an event that can be neither anticipated nor controlled." *Black's Law Dictionary* 657 (7th ed. 1999). A "force-majeure clause" is a clause "allocating the risk if performance becomes impossible or impracticable as a result of an event or effect that the parties could not have anticipated or controlled." *Id.* A force-majeure clause is not intended to shield a party from the normal risks associated with an agreement. 30 Richard A. Lord, *Williston on Contracts* § 77:6, at 299 (4th ed. 2004).

Wells claims the parties to the contract did not intend the force-majeure clause to have its common meaning; thus, Wells is relieved from performing even if a strike, accident, explosion, flood, fire or the total loss of the manufacturing facilities was caused by an event within its control. Had the parties meant to change the common meaning of the force-majeure clause, the parties should have had a discussion or negotiations regarding the definition of a force-majeure event. *See, e.g., Commonwealth Edison Co. v. Allied-Gen. Nuclear Servs.,* 731 F. Supp. 850, 855–56 (N.D. Ill. 1990) (finding that because the parties "deal[t] with the question of regulatory force majeure with considerable specificity . . . it is the contract, rather than a body of judicial doctrine, [the court] must interpret"). The record is clear that when the parties entered into the 1999 production contract they did not negotiate what would constitute a force-majeure event. The only discussion between the parties involved what would be the obligations of the parties if a force-majeure event occurred. Therefore, in light of the lack of discussion between the parties concerning the meaning of the force majeure clause, Wells' claim that the common-law meaning of the force majeure clause does not apply is an unreasonable interpretation of the contract. *See, e.g., Watson Labs., Inc. v. Rhône-Poulenc Rorer, Inc.,* 178 F. Supp. 2d

1099, 1110 (C.D. Cal. 2001) (stating if there is no evidence that the force majeure events were specifically negotiated by the parties, the common law meaning of force majeure is read into the contract).

In addition, Wells' interpretation of the force-majeure clause is not reasonable in light of the purpose of the contract. The purpose of the contract was for Wells to provide Pillsbury with a specific amount of product in a defined period of time. When the contract is read in its entirety, the obligations of each party are described in detail. There is nothing in the language used by the parties, which describes each party's various obligations, that indicates a party's negligence would excuse nonperformance of a specific obligation. Moreover, an agreement excusing a party's performance due to that party's negligence defeats the purpose of having an agreement requiring specific performance within a specified period of time.

Wells' interpretation of the force majeure clause is inconsistent with the absence of any discussions between the parties indicating the common understanding of a force-majeure clause was not intended by the parties and with the purpose of a production contract that requires specific performance to be completed in a specified period. Therefore, the contract is not reasonably susceptible to more than one interpretation.

Accordingly, as a matter of law we find the phrase "that is beyond the reasonable control of that party" modifies all the events enumerated by the parties in the force-majeure clause. Consequently, we find that Wells is not entitled to summary judgment based on the force-majeure clause, and we reverse the district court's ruling on this issue.

Although our ruling on the force-majeure clause is the law of the case, we will not consider whether Pillsbury is entitled to judgment on this issue because it did not move for summary judgment. *See United*

*Fire & Cas. Co. v. Iowa Dist. Ct.*, 612 N.W.2d 101, 103 (Iowa 2000) (holding "an appellate decision becomes the law of the case and is controlling on both the trial court and on any further appeals in the same case"); *see also In re Estate of Campbell*, 253 N.W.2d 906, 908 (Iowa 1977) (holding summary judgment may only be entered "for one who has filed a motion asking that relief and only after notice and hearing on that motion").

## VI.  Disposition.

We remand the case to the district court for further proceedings because we find the district court improperly granted Wells' motions for summary judgment.

**REVERSED AND CASE REMANDED.**

All justices concur except Hecht and Baker, JJ., who take no part.