# IN THE COURT OF APPEALS OF IOWA

No. 16-0934
Filed May 3, 2017

ZIMMER & FRANCESCON, INC.,
    Plaintiff-Appellee,

vs.

RICE LAKE CONTRACTING CORP.,
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Linn County, Sean W. McPartland, Judge.

General contractor Rice Lake appeals the district court's ruling in favor of its equipment supplier following a bench trial on the parties' breach-of-contract claims. **AFFIRMED.**

Jeffrey A. Stone of Simmons Perrine Moyer Bergmann P.L.C., Cedar Rapids, and Nathan R. Sellers of Fabyanske, Westra, Hart & Thomson, P.A., Minneapolis, Minnesota, for appellant.

Daniel P. Kresowik of Stanley, Lande & Hunter, P.C., Davenport, for appellee.

Heard by Vaitheswaran, P.J., and Tabor and Mullins, JJ.

**TABOR, Judge.**

Rice Lake Contracting Corporation appeals the district court's ruling that Rice Lake's supplier, Zimmer & Francescon, Inc. (Z&F), met its contractual obligation to deliver four new motors for intermediate lift pumps as part of a major project undertaken by the City of Cedar Rapids following the 2008 flood.[1] Rice Lake contends the rejection of Z&F's motors by the city and its design engineer, HDR, is binding not only on Rice Lake under its prime contract with the city but also on Z&F under its separate supply contract with Rice Lake. During oral arguments, Rice Lake claimed the district court erred in substituting its judgment for HDR's decision that Z&F's motors did not meet the project's "design intent." According to Rice Lake, the court was not authorized to analyze the terms of its supply contract with Z&F given HDR's discretion to reject Z&F's motors unless HDR acted fraudulently in doing so.

Because we agree with the district court that Z&F met its obligation to Rice Lake to "furnish as submitted" under Rice Lake's instructions regarding these motors, we affirm.

## I. Background Facts and Proceedings

**Construction Project.** Flooding in 2008 damaged equipment at the Cedar Rapids Water Pollution Control Facility (the facility). The city hired HDR as the design engineer for its seven-year permanent improvement plan for the facility. Permanent repairs package 3 (the project) was a final phase in the city's

---

[1] On this project, Z&F supplied motors of varying horsepower to Rice Lake. The four motors at issue had 300 horsepower output. For simplicity and because the issues only concern the 300 horsepower motors, we will refer to the four 300 horsepower motors as "the motors" or "Z&F's motors."

plan. Michael Butterfield served as HDR's principal engineer and project manager. Butterfield stamped and sealed engineering documents prepared under his supervision, indicating the documents were "prepared accurately and appropriately for the design conditions." Butterfield provided his seal of approval on the project's plans and specifications.

The city has general conditions for all of its construction projects. These general conditions are "a variant of the engineering contract documents" and are included in the city's contract with its general contractors. Butterfield explained the city "has a much better working knowledge" of the general conditions but HDR knows the documents "very well."

Z&F, an Iowa company with nine employees, is a manufacturer's representative and distributor of equipment for waste water treatment plants. Andrew Larson, an experienced salesperson, prepared proposals and secured subsequent orders. Larson's May 2012 memorandum told all potential contractors for the project that Z&F intended to submit a proposal to supply equipment, including the motors at issue.

Before Larson submitted Z&F's quotation or proposal, he reviewed HDR's plans and specifications, which set out very specific requirements for the motors. Butterfield explained the specifications, through the use of tasks and key notes, set out the "key design parameters" of the motors—horsepower, volts, rpm, and phases.[2] Larson agreed, stating the specifications "identify the parameters [Z&F

---

[2] At trial, the parties entered joint exhibits into evidence. The applicable specification stated: "Remove existing flood-damaged motors and replace with new. Disconnects at pumps. Have already been replaced. Total of four pumps; each motor 300 HP, 460 Volt, 3 Phases, 585 rpm."

needed] to compare to the pump requirements" and "taken together, are necessary for Z&F to make the proper selection of a motor in its quotation." Larson understood the plans and specifications' intent was for Z&F's motors to be compatible with the pumps.

Z&F did not have amperage requirements for its motors when providing its quotation, even though HDR had specified amperage for other equipment.[3] Neither did the bid documents tell Z&F to "replace in kind" or to "replace with compatible motor," which, similarly, HDR specified for other equipment. Larson understood the plans and specifications for the new motors "weren't asking us to duplicate" the existing motors, and he created Z&F's quotation based on HDR's plans and specifications.

On May 30, 2012, Larson submitted Z&F's quotation to all contractors, bidding to supply more than $1 million in equipment, including the motors. Z&F's scope of work was limited to "furnishing" the equipment. The parties agree Z&F is a "supplier," one who furnishes "materials or equipment to be incorporated in the Work by Contractor or any Subcontractor."

The city hired Rice Lake, a Minnesota company, to be the general contractor for the project. On July 16, 2012, Paul Kujak, the project manager for Rice Lake, accepted Z&F's May 30 quotation by issuing a purchase order to Z&F. The parties agree the purchase order created a contract[4] for Z&F to supply the motors. Rice Lake planned to work with its electrical subcontractor to install the motors after delivery. Rice Lake's purchase order stated:

---

[3] The issue here is the full load amperage, or FLA, of Z&F's motors. To simplify the opinion, we refer to FLA as amperage.
[4] References to "purchase order" and "supply contract" are interchangeable.

<table>
<tr><td colspan="2">Furnish and deliver in accordance with plans and specifications as prepared by HDR Engineering, Inc. for the construction of the City of Cedar Rapids WPCF Permanent Flood Repairs Package 3, including Addenda 1 and 2 and all General Conditions.</td></tr>
<tr><td colspan="2">Furnish Non Clog Centrifugal Pumps in accordance with Sections 11060 and 11061.<br>Wear ring optional pricing: 24"- $8,865/ea; 8" - $910/ea; 3" - $735/ea.</td></tr>
<tr><td>Specification Section       11061</td><td>$   1,091,275.00</td></tr>
<tr><td>Iowa State Sales Tax</td><td>Exempt</td></tr>
<tr><td>   Total</td><td>$   1,091,275.00</td></tr>
<tr><td colspan="2">PO includes freight each way, final alignment, vibration & thermogrpahy testing.<br>Delivery: November 2012<br><b>Shop Drawings</b><br>Provide electronic shop drawings in pdf format for engineer's approval to Paul_Kujak@ricelake.org</td></tr>
</table>

Larson then contacted Fairbanks, the pump manufacturer, to help coordinate Z&F's ultimate purchase through Fairbanks from U.S. Motors. The next month, August 2012, Larson went to the facility to gather additional information for the shop drawings, which are "submittals or technical data." The shop drawings would be drafted by U.S. Motors and transmitted through Z&F to Rice Lake for the general contractor's approval.[5] Larson took a picture of the nameplate on the existing motors, which provided technical data, including the amperage of the damaged motors.

Z&F submitted its first set of shop drawings to Rice Lake, and these drawings set out amperage for its proposed motors. Rice Lake reviewed and approved the shop drawings without changes and forwarded them to HDR with

---

[5] Shop drawings are defined in the prime contract as "[a]ll drawings, diagrams, illustrations, schedules, and other data or information that are specifically prepared or assembled by or for Contractor and submitted by Contractor to illustrate some portion of the Work."

Rice Lake's transmittal letter.[6]   After its review, HDR rejected the first set of drawings on September 26, 2012, instructing Rice Lake to tell Z&F to revise and resubmit the drawings in line with HDR's six detailed comments.   HDR's comments did not call out amperage for the four motors and did not comment on the amperage Z&F specified.

The "engineer review" section of the city's general conditions states the engineer's "review and approval" of shop drawings "will be only to determine if the items covered by the submittals will, after installation or incorporation in the Work, conform" to the contract "and be compatible with the design concept of the completed Project as a functioning whole."   The engineer's approval does not encompass the "means, methods, techniques, sequences, or procedures of construction (except where [such] is specifically and expressly" called for in the contract).   Additionally, the engineer's approval "shall not relieve" the contractor from its "responsibility for any variation from" the contract requirements unless the contractor has called the engineer's attention in writing "to each such variation" at the time the contractor submits shop drawings.   Butterfield testified Rice Lake did not approach HDR with a change order for Z&F's motors.

The "resubmittal procedures" in the city's general conditions state the contractor "shall make corrections required by" the engineer to the shop drawings and "shall return" them for another review by the engineer.   The contractor "shall" in writing "direct specific attention" to any "revisions other than" the engineer's prior corrections on a previous submittal.

---

[6] HDR set out rules for a contractors' stamping of submittals, stating, "[a]ll submittals must be from Contractor" and "[s]ubmittals will not be received from or returned to subcontractors."

On November 9, 2012, Larson responded to Kujak about HDR's comments concerning motor speed, cooling capacity, thermostats, rotation, and bearings, and on November 30, Z&F submitted its second set of shop drawings to Rice Lake. Kujak approved Z&F's second set of shop drawings the same day, stamping Rice Lake had "satisfied Contractor's Obligations" as "to Contractor's review and approval as stipulated under General Conditions." The general conditions state Rice Lake is solely responsible for coordinating the work of its subcontractors and suppliers and Rice Lake's obligations "shall include data which is 'complete with respect to quantitates, dimensions, specified performance and *design criteria*, materials, and similar data." (Emphasis added.) Butterfield explained Rice Lake "had an obligation to verify all of those things under the specifications," and "the shop drawing does not relieve *the contractor* of meeting the intent of the contract documents." (Emphasis added.)

After giving its approval, Rice Lake forwarded the second set of shop drawings to HDR for its review. On December 5, 2012, HDR sent a directive to Rice Lake telling Kujak to instruct Z&F to "furnish as submitted." HDR's comments on Z&F's second submittal included comments on other equipment Z&F was supplying, but HDR did not make any comments about the four motors.

When Butterfield approves shop drawings, he looks for "general conformance with the design and intent with the specs and drawings" and his approval states either "furnish as submitted, furnish as noted, or revise and resubmit." But according to Butterfield, HDR's instruction to Rice Lake to "furnish as submitted" is not "the equivalent of [a] get-out-of jail card if the *contractor* does not follow the plans and specs." (Emphasis added.) Larson testified Z&F relies

on the engineer stamping as verification "the engineer has validated the plans in conformance with our specifications." According to Rice Lake, shop drawings are another way to document communications and can supplement the contract documents. After Z&F was told to "furnish as submitted," it instructed U.S. Motors to manufacture the motors.

On April 1, 2013, Kujak retired and Mark Hinsz became the project manager for Rice Lake. Later in April, Z&F delivered the motors to the project site and invoiced Rice Lake. Rice Lake was not ready to install the four motors at the time of delivery but would work with its electrical contractor to install the motors. Z&F was not responsible for installation.

**Amperage and Existing Wiring.** In the early summer of 2013, a city worker notified Butterfield the amperage on Z&F's motors exceeded the amperage of the damaged motors. On June 18, 2013, Hinsz emailed Z&F, stating the motors had been approved with 475 amperage, the motors as delivered had 452 amperage, and an issue has arisen because the *existing* wiring was undersized for the motor's amperage.

At trial, Butterfield admitted (1) the existing motors' nameplates stated their material characteristics and terms; (2) HDR included material terms in "some, not all" of its specifications; (3) as to the motors at issue, he could have— but did not—make a field inspection, take a picture of the existing motors' nameplates, and plug the nameplate terms into HDR's specifications for the new motors; and (4) he did not know why amperage was not listed in HDR's specifications for Z&F's motors. Butterfield explained HDR's "design intent" was for "in kind replacement" by Z&F's motors so the new motors would operate

"under the same design conditions the original motors did." But Butterfield admitted, although HDR had specified "in kind" other places, it "obviously" had missed specifying "in kind" equipment "in some other places" and such language "probably should have been put in" HDR's specifications for Z&F's motors.

After communications about making Z&F's motors work for the project, on July 31, 2013, Rice Lake sent a letter to the city outlining six different options, including using Z&F's motors with capacitors or Rice Lake "providing brand new motors." In response, Butterfield e-mailed project manager Hinsz on August 9, 2013, copying city officials: "[T]he City and HDR have reviewed and discussed Rice Lake's proposals. As previously discussed, the intent of the design was for the replacement motors to meet the design conditions of the original motors; new capacitors are not acceptable due to future projects." Butterfield instructed Rice Lake to either develop modifications to the Z&F motors "such that the motors meet the design conditions of the original motors" or provide new motors.

Hinsz testified Butterfield had not previously discussed design intent with him, and Hinsz did not know whether Butterfield had discussed design intent with Kujak. In fact, Hinsz did not know what Butterfield meant by "design conditions." Larson testified he did not usually associate design conditions with motors.

Ultimately, the city required Rice Lake to provide new motors. According to Hinsz, Z&F's motors were rejected by the owner and the engineer because they did not meet the "general intent" of the prime contract.

Due to the complexity of obtaining replacement motors that would meet all necessary requirements, Rice Lake did not issue a purchase order to a different supplier, Hupp Electric, until April 2014—more than a year after Z&F

furnished and delivered its motors. Before issuing this purchase order, Rice Lake provided Hupp with the amperage of the existing motors and advised Hupp the motors' amperage had to be compatible with the existing wiring. Neither Rice Lake nor HDR had told Z&F that information before Z&F delivered its motors. Hupp's purchase order also contained new language requiring Hupp to "furnish in accordance with approved submittals."

Like Z&F, Hupp used U.S. Motors to manufacture its replacement motors. Rice Lake paid Hupp $204,000 and installed Hupp's motors in 2014. The Z&F motors remain in storage, and Rice Lake refused to pay Z&F's invoice.

**Litigation.** On February 18, 2014, Z&F sued Rice Lake for breach of contract, alleging it had "relied on Rice Lake's verification" the four motors "should be furnished as submitted." Rice Lake filed a counterclaim, asserting it was Z&F's obligation to make sure its motors conformed to the plans and specifications *and* "would work with the existing wiring" because "the general intent of the plans and specifications was that the new equipment would function within the existing systems."

The district court heard the parties' claims in a two-day bench trial commencing on August 10, 2015. Hinsz explained "the intent of the submittal review is to identify deviations, so that kind of goes hand in hand with the submittal and the shop drawing review." In his deposition, Hinsz stated he could not point to any specific project requirement or provision from which Z&F's motors deviated. But after his deposition, Hinsz reviewed the contract documents and concluded Z&F's motors deviated from general conditions

section 6.03B as the motors were not "operable" motors for the existing system.[7] By "existing system," Hinsz meant "a motor is just one component of the pump, the piping, the electrical, the system." Hinsz testified Z&F "should *not* have furnished as submitted as directed by Rice Lake" because Rice Lake "needed a motor that worked" with the system. (Emphasis added.) Hinsz opined that the "all general conditions" language in the supply contract meant whatever obligations Rice Lake had to the city with regard to Z&F's portion of the project, Z&F similarly owed to Rice Lake if Z&F "had actions that contributed to that issue." Hinsz testified:

> Q. Was it Z&F's responsibility to provide motors that would work with the existing system no matter the manner in which those components in the existing system changed? A. I guess it depends . . . I can only say . . . the plans and specs govern. Now, if there was a manner of them changing outside of [Rice Lake's] control and the contract documents, then I wouldn't have expected Z&F to coordinate that . . . . I can only go by the rules of the plans and specs . . . .
> Q. And if there is something specific in the plan or specific within the scope of Z&F's work, they should comply with that? A. Yes.

Butterfield explained HDR had a contract with the city, not with Rice Lake or Z&F, and "all of the descriptions and plans and specifications are to Rice Lake." He testified it was incumbent on Rice Lake to have its own contract with its suppliers. Although Butterfield admitted Z&F's motors satisfied the plans and specifications, he nevertheless asserted the "design intent" for those motors was to "operate the pumps under the same design conditions that the original motors

---

[7] Article six of the general conditions details contractor's responsibilities and section 6.03B states suppliers "implicitly warrant" their products "are suitable and fit for the intended use" and "shall be free from defect in material, workmanship or design, such warranty to run to the benefit of Owner and Engineer."

did." After Butterfield testified the city and HDR rejected Z&F's motors for not meeting the project's "design intent," the following exchange occurred:

> THE COURT: . . . Where do I look to see this intent of the design?
> BUTTERFIELD: Best I can say is that the intent of the design was inherent to—was inherent within the contract documents . . . . [We are] grabbing any information that we can to put on the drawings . . . . Not all of the information . . . got into the drawings . . . . [T]he vast majority of it was replacement in kind.
> THE COURT: But so wouldn't the simple thing be to just include those simple words, intent is replacement in kind?
> BUTTERFIELD: Yes.
> THE COURT: . . . [I]s there something in [the exhibits] that I can look to see that?
> BUTTERFIELD: I don't think those words were included for these motors. It was certainly included for a number of other items.

The district court found the Z&F motors delivered to Rice Lake met the general contractor's instruction to "furnish as submitted." The court entered judgment for Z&F in the amount of $145,590, plus interest, noting the issue would have been resolved easily had the contract documents included "the clarifying language that Rice Lake asks the Court to read into the contract documents" but "the duty to spell out or discern such matters was not the responsibility of the [s]upplier, Z&F."

Rice Lake now appeals.

## II. Scope and Standards of Review

This contract action was tried at law to the district court, and our review is for correction of errors at law. *See Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 862 (Iowa 1991). We are bound by the district court's findings of fact where they are supported by substantial evidence. *Id.* But

we are not bound by the court's "application of legal principles or its conclusions at law." *Id.*

Contract interpretation is the process for determining the meaning of the words used by the parties to a contract. *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 435 (Iowa 2008). "Interpretation of a contract is a legal issue unless the interpretation of the contract depends on extrinsic evidence." *Id.* Construction of a contract, the court's process of determining the words' legal effect, is always a legal question. *Id.*

### III. Analysis

Rice Lake contests the district court's judgment in favor of Z&F, asserting supplier Z&F should bear the cost of its motors' incompatibility with the design intent of the motors' amperage coordinating with the existing wiring. In doing so, Rice Lake poses three cascading questions. First, did "Rice Lake and Z&F agree HDR had broad authority to interpret the [supply contract's][8] requirements and to approve or reject materials and equipment furnished on the project?" Second, "if Rice Lake and Z&F so agreed, was HDR's interpretation of the [supply contract's] requirements and rejection of Z&F's . . . motors conclusive and binding?" Third, if HDR's rejection was binding, did Z&F breach the supply contract by not replacing its noncompliant motors?

---

[8] The brackets replace "subcontract" with "supply contract." In the general conditions, a "subcontractor" is one "having a direct Contract with Contractor or with any other Subcontractor for the *performance* of a part of the Work *at the Site.*" (Emphasis added.) Z&F delivered the motors to the site but did not even unload them. Therefore, even though Rice Lake's brief consistently calls its contract with Z&F a subcontract, a supplier differs from a subcontractor. Under the definition of supplier, the contract between Rice Lake and Z&F is a supply contract.

In response, Z&F emphasizes its limited role as a supplier and the fact it had no contractual relationship with either HDR or the city. Z&F disputes the notion that HDR, as design engineer, exercised any authority over the process by which Rice Lake approved Z&F's motors for delivery to the project site.

A cardinal principle of contract construction is "the parties' intent controls," here, the intent of Z&F and Rice Lake in the supply contract. *See id.* But Rice Lake's focus on HDR's alleged authority to interpret the parties' supply contract tends to blur the existence of multiple contracts. We start our analysis with a discussion of Rice Lake's obligations under the prime contract.

Butterfield testified contractor Rice Lake "had an obligation to make the motors work with the pumps" and the city's "ultimate decision was to ask for replacement motors" from Rice Lake under the prime contract. He also testified: (1) the general conditions require contractors, subcontractors, and suppliers "to include" in their "scope of work, things that may not be explicitly stated [in the plans and specifications] but can be reasonably inferred from what is stated"; (2) if HDR's plans and specifications, although imperfect, would lead a reasonable person to conclude that what needs to be supplied is a "plug and play" motor, then that is what has to be provided to the city; and (3) the city had the contractual right to insist *Rice Lake* replace Z&F's motors, which would need modifications and did not "meet the design intent," with "plug and play" motors that "would meet the intent of the design."[9]

---

[9] The prime contract between Rice Lake and the city states:

It is the intent of the Contract Documents to describe a functionally complete Project (or part thereof) to be constructed in accordance with the Contract Documents. Any . . . documentation . . . or equipment that

Rice Lake admits the prime contract required that it replace the motors at no cost to the city. A factor leading to that consequence was Rice Lake's failure—as the general contractor obliged under the prime contract to coordinate the work of its suppliers and electrical subcontractors—to ensure that Z&F matched the motors' amperage to the existing wiring in fulfillment of the engineer's "design intent." The question is whether Rice Lake, who claims it relied on Z&F's expertise, can pass the costs of its own obligation under the prime contract down to its supplier.

The duties imposed on suppliers by the general conditions in the prime contract were addressed by several witnesses. Larson testified the general conditions do not state Z&F, as a supplier for Rice Lake, "owes the owner the same duties that Rice Lake owes the owner" with regard to equipment supplied by Z&F. Butterfield acknowledged, under the general conditions, Z&F has to do "what [a] supplier is supposed to do in the contract documents," and it doesn't "step into Rice Lake's shoes and all of a sudden become responsible for coordinating with any electrical contractors." But Butterfield opined Z&F did step into Rice Lake's shoes as to supplying motors. Hinsz testified the "electrical" section in the prime contract is not in Z&F's "scope of supply."

On appeal, Rice Lake claims the parties agreed in the supply contract "to give broad discretion to the [c]ity and HDR to judge the acceptability of Z&F's work and reject that work in good faith if certain conditions were not met." Rice

---

may reasonably be inferred from the Contract Documents or from prevailing custom or trade usage as being required to produce the intended result will be provided whether or not specifically called for at no additional cost to Owner.

Lake contends, under Iowa law, HDR's "discretion is binding absent fraud, bad faith, or failure to exercise ordinary care."

The record does not support Rice Lake's contention. Butterfield did not offer an opinion as to which party *under the supply contract*, Rice Lake or Z&F, was contractually obligated to shoulder the responsibility for the replacement motors*.* And the general conditions expressly limit the interactions between Z&F as the supplier and both engineer-HDR and owner-city. First, the general conditions require suppliers to communicate with the engineer through Rice Lake. Second, they provide that nothing in the prime contract shall create a contractual relationship between the owner or engineer and the supplier, "nor shall it create any obligation on the part of [the owner or engineer] to pay or to see to the payment of any moneys due any such" supplier. Thus, the prime contract specifically removes both the owner and the engineer from Rice Lake-Z&F payment disputes.

Additionally, the prime contract specifically requires Rice Lake to step in the shoes of its supplier: "Contractor shall be fully responsible to Owner and Engineer for all acts and omissions of the [Suppliers furnishing] any of the Work just as Contractor is responsible for Contractor's own acts and omissions." Rice Lake cites no similar contract provision, in either the prime contract or the supply contract, stating Z&F "shall be fully responsible" to Rice Lake by undertaking Rice Lake's obligations to coordinate work as the project's general contractor.[10]

---

[10] In support of its position Z&F is responsible for Rice Lake's obligations, Rice Lake quotes *Central Iowa Grading, Inc. v. UDE Corp.*, 392 N.W.2d 857, 860 (Iowa 1986), a case in equity involving statutory mechanic's liens, which broadly states: "The principal contractor is, of course, bound by the terms of his contract with the owner. In the

Rice Lake relies on *Peter Kiewit Sons' Co. v. Iowa Southern Utilities Co.*, 355 F. Supp. 376, 393 (S.D. Iowa 1973), for the proposition, when parties to a construction contract "agree to abide by discretionary decisions of the project engineer, the terms of the contract will be given full force and effect and the parties will be bound by the decision of the engineer." But *Kiewit* is distinguishable; the question involved *a general contractor's* ability to enforce *against the owner* a contract term in the contractor-owner prime contract regarding the engineer's discretionary authority as between the general contractor and the owner. In fact, the similar terms in Rice Lake's prime contract

---

absence of statutory modification, subcontractors are also bound by the terms of the contract between the owner and the principal contractor." The instant case differs from the situation in *Central Iowa Grading.* First, the issues before us are not grounded in a mechanic's lien suit in equity and do not involve a *subcontractor's contract* with its general contractor. Second, of the nine cases citing *Central Iowa Grading*, three involve the same bankruptcy proceedings and the effect of change orders. *See In re Cent. States Mech., Inc. v. Agra Indus. Inc.*, No. 09-12542, 2011 WL 1637991, at *34-35 (Bankr. D. Kan. Apr. 29, 2011) (discussing change orders in Iowa project involving subcontractor), *aff'd*, No. 11-1129, 2012 WL 3896940, at *13 (D. Kan. Sept. 7, 2012) (stating Iowa law allows waiver of requirement change orders be written), *aff'd*, 556 F. App'x 762, 770 (10th Cir. May 21, 2014) (same). One case citing *Central Iowa Grading* involves West Virginia law. *See Pasquale v. Ohio Power Co.*, 413 S.E.2d 156 (W. Va. 1991) (discussing change orders in context of wrongful death action). The other five cases cite to *Central Iowa Grading*'s analysis of a waiver of change orders and/or involve statutory mechanic's liens. *See Ead Control Sys. LLC v. Besser Co. USA*, No. C11-4029, 2012 WL 2357572, at *6 (N.D. Iowa June 19, 2012) (discussing change orders in the context of subcontractor's extra work and unjust enrichment claim); *Carson v. Roediger*, 513 N.W.2d 713, 716 (Iowa 1994) (resolving subcontractor's action against homeowners to foreclose mechanic's lien and recognizing "mechanic's lien is purely statutory in nature"); *Eherenman v. Warren*, No. 13-1764, 2014 WL 7343386, at *2 (Iowa Ct. App. Dec. 24. 2014) (discussing change orders in the context of mechanic's liens); *Palmer v. Glasbrenner*, No. 03-0492, 2004 WL 1159736, at *3 (Iowa Ct. App. May 26, 2004) (discussing change orders and subcontractor's extra work in context of mechanic's lien); *Booth v. Pilot Corp.*, No. 99-0925, 2001 WL 726364, at *6 (Iowa Ct. App. June 29, 2001) (resolving mechanic's lien dispute as to change orders and extra work). These cases show *Central Iowa Grading* is distinguishable. No Iowa court has applied the broad proposition Rice Lake cites in a similar contract analysis.

with the city[11] enabled the city to enforce against its general contractor, *without dispute by Rice Lake*, the city's decision Z&F's motors did not meet the implied "design intent" of the prime contract.

Here we are faced with a much different question—does Z&F's supply contract with Rice Lake allow the general contractor to saddle its supplier with the consequences of the city's decision—made under its prime contract with Rice Lake—to reject the motors previously approved by Rice Lake and HDR? The purchase order did not reveal any agreement by Z&F that HDR had the authority to decide whether Z&F—as opposed to Rice Lake—was the party responsible for ensuring the motors complied with the implied "design intent"—even after Rice Lake had instructed Z&F to furnish as submitted and Z&F complied. *See, e.g.*, *Granette Prods. Co. v. Arthur H. Neumann & Co.*, 203 N.W. 935, 937-38 (Iowa 1925) (finding initially, plaintiff was a subcontractor not a "mere seller," and then concluding where (unlike here) *the subcontract* "expressly provided [plaintiff's work] was to be subject to the approval of the architects," the district court erred in striking general contractor's answer alleging this language "meant" architect's "approval in accordance with the principal contract").[12]

The purchase order obligated Z&F to "furnish and deliver in accordance with plans and specifications as prepared by HDR Engineering, Inc. for the

---

[11] Making no reference to suppliers or subcontractors, section 9.06 states the engineer can "disapprove or reject" work the engineer "believes to be defective, or . . . believes will not produce a completed Project" conforming to the prime contract "or that will prejudice the Integrity of the design concept of the completed Project as a functioning whole" under the prime contract.

Making no reference to suppliers or subcontractors, section 9.09 states: "Engineer will be the initial interpreter of the requirements of the [prime contract] and judge of the acceptability of the work thereunder."

[12] The subcontract expressly stated: "All of the [subcontractor's] work to be subject to the approval of the [architects]." *Granette Prods.*, 203 N.W. at 936.

construction of the City of Cedar Rapids WPCF Permanent Flood Repairs Package 3, including Addenda 1 and 2 and all general conditions." Rice Lake reads the reference to "all general conditions" as requiring the supplier to shoulder the responsibilities of the general contractor to ensure the motors fit the project's specifications *and* the implied "design intent" of not exceeding the existing motors amperage and of working with the existing wiring. But a glance at the table of contents for the "general conditions" in the prime contract shows articles detailing the *responsibilities* of the contractor (Article 6) and the owner (Article 9), but no similar article detailing the responsibilities of suppliers. The responsibilities listed for contractors under Article 6 are myriad and include coordinating work between subcontractors and suppliers. The reference to "all general conditions" in the purchase order did not have the sweeping impact on Z&F now alleged by Rice Lake.

We find it significant neither the purchase order nor subsequent directives from Rice Lake specified any amperage for the four motors. Larson from Z&F explained he was not trying to match any specifications from the damaged motors. Rather, he was trying to meet the requirements he had been given in the specifications and in HDR's comments. Butterfield testified HDR's plans and specifications listed the required amperage when it was "critical" to the task, HDR should have included the amperage for the motors, and he did not know why it was not included along with parameters for horsepower, volts, phases, and rpm. Butterfield did not believe Rice Lake advised Z&F "that matching the nameplate" amperage was "critical."

The rule that express mention of one thing in a class implies the exclusion of others applies to contract interpretation. *See Peak v. Adams*, 799 N.W.2d 535, 548 (Iowa 2011). Here, *after* Z&F received detailed specifications about horsepower, volts, phases, and rpm and *after* Z&F provided additional information about speed, cooling capacity, thermostats, rotation, and bearings, Rice Lake told Z&F to "furnish as submitted." Under Iowa law, the express mention of those specific and detailed requirements for Z&F's motors control over any *implied* design intent Rice Lake now asserts Z&F should have discerned under the general conditions in the prime contract. *See id.*

Further, Z&F twice provided the amperage of its proposed motors in a specific and unambiguous manner in the shop drawings and was then told by Rice Lake to "furnish as submitted." *See id.*; *see also Iowa Fuel & Minerals, Inc.*, 471 N.W.2d at 863 (stating where a contract has both "general and specific provisions on a particular issue, the specific provisions are controlling"). Given the unambiguous language of the supply contract between Z&F and Rice Lake, and given Z&F's limited scope of work to "furnish" motors, the supply contract did not obligate Z&F to go searching for an "implied" design intent under the general conditions section of Rice Lake's contract with the city after Rice Lake told Z&F to "furnish as submitted." Our conclusion is supported by the testimony of Rice Lake's Hinsz:

> Q. If there is a specific intent from the city, that's incumbent on the City to communicate that to their engineer or general contractor, isn't it? A. Correct.
> Q. As general contractor, you want to know what your boss or the city's intent, is don't you? A. Always.
> Q. And then . . . if it's not conveyed in documents, it would be incumbent on you as general contractor to convey that intent to

your subcontractor and suppliers, wouldn't it?  A. Yep, clear chain of communication.

Finally, we share the district court's view that this litigation could have been avoided if the specifications for or comments to Z&F's shop drawings had included an amperage level, alleviating the need to read "clarifying language" into the contract documents.  As the district court insightfully observed, the issues arose "largely from the failure of the contractual provisions to specify for Z&F as the [s]upplier the equipment particulars that ultimately were required.  To the extent that a company or party should have foreseen such issues," that party is "not the [s]upplier of the motors, who provided what was specifically called for in the contract documents; who followed the procedures for submitting and receiving approval of shop drawings; and who delivered the equipment in conformity with the obligations set forth in the contract."

**AFFIRMED.**