## IN THE COURT OF APPEALS OF IOWA

No. 16-1610
Filed July 19, 2017

**TOMMY THOMPSON,**
      Plaintiff-Appellee,

**vs.**

**JTTR ENVIRO, L.L.C.,**
      Defendant-Appellant.
_____

      Appeal from the Iowa District Court for Plymouth County, Jeffrey L. Poulson, Judge.


      JTTR Enviro, L.L.C. appeals a bench trial verdict in favor of Tommy Thompson arising from a manure easement agreement.  **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**


      Jeff W. Wright and Jacob V. Kline of Heidman Law Firm, L.L.P., Sioux City, for appellant.

      Chad C. Thompson of Thompson, Phipps & Thompson L.L.P., Kingsley, for appellee.


      Heard by Vaitheswaran, P.J., and Tabor and Mullins, JJ.

**MULLINS, Judge.**

JTTR Enviro, L.L.C. appeals a bench trial verdict in favor of Tommy Thompson arising from a manure easement agreement (MEA). JTTR claims the district court (1) improperly imposed a burden upon it, as the grantee of the MEA; (2) improperly increased the burden placed on JTTR under the MEA; (3) improperly interpreted the MEA to contemplate a corn-on-corn rotation; and (4) awarded excessive damages. We affirm in part, reverse in part, and remand.

## I.      Background Facts and Proceedings

The facts of this case are generally not in dispute and aptly summarized by the district court:

> In the spring of 2012, Tommy Thompson purchased approximately 146 acres of farmland from Ricke W. and Marian T. Langel. The Langels retained a 10.25 acre parcel upon which a hog farrowing facility was located. . . .
> The unrecorded real estate contract between Thompson and the Langels provided that Thompson would give the Langels a permanent easement on the 146 acres and a separate manure easement would be created at closing. The contract recited that the Langels or the existing swine facility would place manure on the 146 acres. If [the] Langels or the existing swine facility used the easement, Thompson would pay all pumping and application costs. The contract provided that Thompson would receive enough manure to cover the 146 acres and any additional manure generated by the facility would be made available to Thompson at market price.[1]

---

[1] Specifically, the addendum to the real estate contract provided, with certain provisions handwritten on the otherwise typed contract, the following:
> BUYERS agree to give SELLERS or existing swine facility a Permanent Manure Easement over the property. The parties agree to enter into a separate Manure Easement Agreement at closing whereby SELLERS or existing swine facility will place manure on the real estate. In the event SELLERS or existing swine facility use this easement, BUYERS will pay all pumping and application costs. The particulars of said manure easement will be set forth in a separate Manure Easement Agreement. Buyers will receive enough manure to cover the 146 acres. Any additional manure will be made available at market price.

As agreed to in the real estate contract, a manure easement was drafted, signed, and recorded on May 24, 2012. The easement agreement noted that [the] Langels desired the agreement as a means of applying manure and other animal waste generated from the hog facility on Thompson's farmland. The agreement also noted that Thompson would receive the benefit of reduced costs and expenses with regard to fertilizer application. . . .

The easement agreement grants to [the] Langels the right to apply manure and other animal waste generated by the hog facility on Thompson's 146 acres. The agreement is permanent and runs with the land and is binding upon successors and interest.

Under the agreement, Thompson is solely responsible for all costs associated with the application of manure and animal waste on the 146 acres. . . . Application should be permitted after crops are harvested in the fall of any calendar year and up until the time of planting the following spring.

. . . . The agreement provided that the hog facility was currently empty and that in the event the facilities are filled and the need to empty the pits and lagoons of manure arises, Thompson shall be allowed as much manure as needed to cover the 146 acres. If there is excess manure, Thompson may purchase that manure at the then market price.

Thompson is responsible for application of manure in compliance with applicable law or regulations, including [the] Langels' manure management plan. . . .

. . . .

In August of 2012, the 10.25 acre and associated hog facility was sold by the Langels to JTTR Enviro, LLC. . . . Following the purchase, JTTR dramatically remodeled the hog facility and rebuilt it into a hog finishing facility. The building exterior and the [manure] pit remain unchanged, but the building's interior is new and entirely different.

The facility was placed in production during the spring of 2013. In the fall of 2013, it became necessary to empty the pit. Thompson demanded enough manure to apply on his entire 146 acre parcel consistent with the [MEA].[2]

JTTR filed a manure management plan which provides that Thompson would maintain a corn-soybean rotation. Because of the nitrogen credit associated with raising soybeans, no manure would

---

Notably, the contract originally read: "The parties agree to enter into a separate Manure Easement Agreement at closing whereby SELLERS or existing swine facility may, at their discretion but are not required to, place manure on the real estate." The phrase "may, at their discretion but are not required to," was manually stricken with "will" written in its stead.

[2] JTTR argues the pit needed to be emptied before Thompson's crops had been harvested—and the MEA permits application of the manure only after crops have been harvested—but JTTR provided 73-acres worth of manure anyway.

be applied in bean years. Because of [t]his, JTTR demanded that either the manure be applied every other year or that 73 acres of manure would be provided annually. Thompson accepted 73 acres of manure in the fall of 2013. He has received no further manure since the fall of 2013.

In May 2014, Thompson filed suit, alleging JTTR breached the MEA. A bench trial was held in July 2016. In August 2016, the district court returned a verdict in favor of Thompson, awarding damages in the amount of $70,433.93 plus $15,451.81 in attorney fees. JTTR filed a motion for new trial and motion to enlarge or amend findings of fact and conclusions of law, which Thompson resisted and the district court denied. JTTR appeals.

## II.     Standard and Scope of Review

We review a district court's decision arising from a bench trial for correction of errors at law. *See Chrysler Fin. Co. v. Bergstrom*, 703 N.W.2d 415, 418 (Iowa 2005). If supported by substantial evidence, the district court's findings of fact are binding on appeal. *See id.*

## III.     Analysis

### A.     Burden

JTTR first argues the court erred in imposing any burden upon it, because the document at issue is an easement agreement; JTTR is the recipient of that easement; and, therefore, a burden can only be imposed upon Thompson as the grantor. In JTTR's briefing on appeal, JTTR does not argue that the specific terms of the easement fail to impose a burden but, rather, that easements generally cannot impose a burden on easement recipients. Thompson argues JTTR did not preserve error on this issue. Even if this argument had been preserved, we do not find it persuasive.

As a general matter, the law recognizes that burdens are also placed on easement holders. *See Koenigs v. Mitchell Cty. Bd. of Supervisors*, 659 N.W.2d 589, 594 (Iowa 2003) ("[E]asement holders have all such rights as are incident or necessary to the reasonable and proper enjoyment of their easement. However, every benefit has a corresponding burden." (citation omitted)). Further, we note JTTR cites no law providing parties cannot contract to impose obligations upon easement holders; JTTR simply relies upon the oft-stated maxim that easements create interests for one person in the land of another resulting in a burden on the servient estate. *See McKeon v. Brammer*, 29 N.W.2d 518, 524 (Iowa 1947).

Regardless, here, there is a written contract that contains the terms agreed to by the parties. *See Koenigs*, 659 N.W.2d at 594 ("[T]he parties have a contract dictating the extent of the County's easement and consequent obligations. As such, the issue of the County's duty to maintain the ditch is entirely one of contract."). Easements are subject to ordinary contract principles. *See Tiemessen v. All. Pipeline (Iowa) L.P.*, No. 14-1727, 2016 WL 351471, at *5 (Iowa Ct. App. Jan. 27, 2016); *see also McGrane v. Maloney*, No. 08-1502, 2009 WL 929048, at *1-2 (Iowa Ct. App. Apr. 8, 2009). Accordingly, it is our responsibility on appeal—and the district court's duty below—to consider the terms of *this* contract and the parties agreed-upon responsibilities under its terms. *See State v. Baldon*, 829 N.W.2d 785, 792 (Iowa 2013) ("[C]ourts enforce contracts because they are a product of the free will of the parties who, within limits, are permitted to define their own obligations.").

Thompson and the Langels entered into a real estate contract that provided a manure easement agreement would be executed. The addendum to

this real estate contract said: "SELLERS or existing swine facility will place manure on [Thompson's] real estate" with Thompson "receiv[ing] enough manure to cover the 146 acres." The MEA provides "in the event the facilities are filled and the need to empty the pits and lagoons of manure arises, [Thompson] shall be allowed as much manure as needed to cover the ground associated with this easement." Further, "[i]f there is excess manure, [Thompson] may purchase that manure at the then market price." The terms of the agreement explicitly impose a burden upon JTTR as the successor of the Langels and reflect the parties' intent to impose such a burden. Those terms are controlling. We, accordingly, affirm the district court on this issue.

### B.     Finishing Manure

JTTR next argues the district court order impermissibly imposed a greater burden on JTTR than contemplated by the MEA. *See C & M Prop. Mgmt. Co. v. Bluffs U.P. Emps. Credit Union*, 486 N.W.2d 596, 597 (Iowa Ct. App. 1992) ("Generally, the servient estate is not to be burdened to a greater extent than was contemplated at the time of the creation of the easement."). There is nothing in the record indicating the district court considered this argument, let alone ruled upon it.[3]

Assuming this argument had been preserved, general principles of contract interpretation apply.

---

[3] Instead, the district court addressed whether the hog facility—as updated by JTTR—was still governed by the MEA. The district court found it was, reasoning, "although [the facility] has been materially changed," "[t]he outside buildings are unchanged and the original pit is in use." On appeal, JTTR does not argue the building itself is somehow outside the scope of the MEA.

> The cardinal rule of contract interpretation is to determine what the intent of the parties was at the time they entered into the contract. "Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight." Another relevant rule of contract interpretation requires that "[w]herever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade."

*Pillsbury Co. v. Wells Diary, Inc.*, 752 N.W.2d 430, 435 (Iowa 2008) (alteration in original) (citations omitted).

JTTR contends this "greater burden" arises from the fact that—based on the alterations made by JTTR—the manure produced is now far more valuable, as manure from a finishing barn is more nutrient-rich than manure from a farrowing barn. JTTR reasons that, when drafting the MEA, the "parties clearly contemplated the MEA would apply to a farrowing barn." Assuming such a marked increase in the value of the manure exists, JTTR points to nothing in the MEA or record that supports the parties contemplated such a limitation when the MEA was executed.

We look first to the language of the MEA, as the agreement's words are "the most important evidence of the part[ies'] intentions at the time they entered into the contract." *Id.* at 436. The MEA provides the Langels have "a hog confinement farrowing/finishing facility." Nothing in the MEA indicates either party intended the MEA to apply only to farrowing manure as opposed to finishing manure. To the contrary, it is written to apply generally to "manure and other animal waste generated by the livestock facilities." JTTR argues, "Nobody . . . contemplated the lengthy process of converting [the farrowing barn] into a finishing barn." But JTTR cites nothing to support this conclusion or to

indicate the MEA's broad wording was not intended to cover such a contingency.[4] Accordingly, we affirm the district court on this issue.

### C. Crop Rotation

JTTR next argues the district court erred in interpreting the MEA to adopt a corn-on-corn rather than corn-on-soybean crop rotation. At issue is whether the manure would need to be applied annually (under the corn-on-corn rotation) or every other year (under the corn-on-soybean rotation). In its summary judgment ruling, when interpreting the MEA language stating "[b]uyers will receive enough manure to cover the 146 acres," the district court found the term "cover" was ambiguous.

At trial, both Ricke Langel and Thompson testified as to their intent when entering into the MEA. Rick Langel stated he intended the MEA to employ a corn-on-soybean rotation; Thompson testified to the opposite, stating a corn-on-corn rotation was contemplated. After determining either interpretation was reasonable, *see Pillsbury*, 752 N.W.2d at 436 ("When the interpretation of a contract depends on the credibility of extrinsic evidence or on a choice among reasonable inferences that can be drawn from the extrinsic evidence, the

---

[4] JTTR relies on two cases: *Schwob v. Green*, 215 N.W.2d 240 (Iowa 1974), and *Schwartz v. Grossman*, 173 N.W.2d 57 (Iowa 1969). In *Schwob*, the easement at issue was one of "implication or necessity," not "written grant or prescription." 215 N.W.2d at 241. The defendant needed to use private roads in order to access property; however, he had converted the property for commercial use, resulting in a marked increase in the use of the private road. *Id.* at 242. Looking specifically within the context of an implied easement, the supreme court affirmed the district court's finding the easement was granted only as to the defendant and his personal use, not to broader commercial use. *Id.* at 243. In *Schwartz*, the plaintiff had an undisputed easement to use an alleyway. 173 N.W.2d at 59-60. The defendant then constructed various improvements that hindered the plaintiff's use of the alleyway. *Id.* The court concluded these improvements "substantially destroyed the benefit of plaintiff's right." *Id.* at 60. Neither of these cases is analogous to the case before us.

question of interpretation is determined by the finder of fact."), the court explicitly found Ricke Langel's testimony was not credible, stating his testimony[5] was motivated by his desire to sell the hog facility. Upon our review of the record, we defer to that finding. *See State v. Weaver*, 608 N.W.2d 797, 804 (Iowa 2000) ("Determinations of credibility are in most instances left for the trier of fact, who is in a better position to evaluate it.").

In addition to weighing the testimony of the contracting parties, the district court considered the testimony of the Langels' attorney, who represented their interests when entering into the purchase agreement with Thompson and resulting MEA. In an affidavit, the Langels' attorney admitted, "There were no discussions between [himself, Thompson, Thompson's son, or Thompson's attorney] concerning the [MEA] being limited to a certain crop rotation."

Finally, the district court reviewed and found most compelling the terms of the contract. The district court relied upon the following sentence, which appears twice in the MEA: "Application [of the manure] shall be permitted after crops are harvested in the fall of any calendar year during the term of this agreement and up until the time for planting the following [s]pring." The district court noted there was no reference to fertilizing taking place every other year or that fertilizing would occur on only half the property each year. To the contrary, the MEA provides, "in the event the facilities are filled and the need to empty the pits and lagoons of manure arises, [Thompson] shall be allowed as much manure as needed to cover the ground associated with this easement." The parties agree the ground associated with the easement is the entire 146 acres. The district

---

[5] Ricke Langel's testimony was provided by deposition transcript.

court concluded the MEA "provided for annual applications of fertilizer, limited only by whether or not the manure was generated in the facility."[6]

There are no temporal limitations provided in the MEA beyond references to annual occurrences.[7] The MEA provides:

> [Thompson] may sample the manure prior to application and if [he] do[es], shall provide the results to [JTTR]. If, after the sample is taken, [Thompson] has any concerns, [Thompson] shall immediately contact [JTTR] to discuss the application plan *for that given year.*

(Emphasis added.) JTTR attempts to avoid this annual provision by arguing Thompson can apply manure to half of the property each year. But the MEA says Thompson is "allowed as much manure as needed to cover the ground associated with the easement" when "the facilities are filled and . . . need to [be] empt[ied]." There is simply no indication of the limitation JTTR seeks to impose, apart from Ricke Langel's testimony, which the district court found was not credible.

In support of its claim a corn-on-soybean rotation should apply, JTTR notes this form of crop rotation is a normal farming practice and Thompson planted soybeans, not corn, in 2012 and 2016. But interpreting the MEA to conform to this "usage of trade" is not "reasonable" in light of the language of the MEA itself. *Pillsbury*, 752 N.W.2d at 436. Further, the record reflects the MEA was entered into in May 2012, and at that time the manure pits were empty.

---

[6] This interpretation is also supported by the wording of the addendum to the purchase agreement, which provided "[b]uyers will receive enough manure to cover the 146 acres."

[7] Consistent with this annual approach, Thompson is required to "keep and provide [JTTR] with annual crop yield records" and "records of nutrient applications other than [JTTR's] manure."

Thompson testified he planted soybeans in 2012 because he acquired the land so late in the year only soybeans could be planted. As for 2016, JTTR stopped providing manure in 2013. Accordingly, we cannot rely upon Thompson's use of soybeans as crop in 2012 and 2016—which do not require the same level of fertilization as corn—in years when no manure was provided as proof of what Thompson would have done and intended to do had manure been provided. We, therefore, affirm the finding of the district court on the crop rotation issue.

### D.    Damages

Finally, JTTR argues the district court erred in calculating damages. Thompson argues he suffered a total of $70,433.92 in damages from 2013 through 2015.[8] According to his trial exhibit, Thompson reached this number by utilizing the cost of commercial fertilizer. Thompson multiplied the "value of fertilizer by gallon applied" with the number of "acres covered." In 2013, Thompson calculated his damages at $15,542.20 to cover half of his acreage, as JTTR provided half of the manure required. In 2014 and 2015, Thompson calculated his damages at $28,367.79 and $26,523.93, respectively, for coverage of the full allotment of acres. In its order, the district court summarily found "the damages established by the evidence are caused by the breach and reasonably calculated" and awarded the full $70,433.92.

JTTR raises four issues on appeal: (1) the district court erred in awarding damages for JTTR's failure to provide the full 146-acres worth of manure in 2013; (2) the district court erred in awarding damages for JTTR's failure to provide

---

[8] This represents the years the fertilization was applied, with the crop to be harvested the following year.

manure in the fall of 2015; (3) the district court erred in using the cost of commercial fertilizer as the measure of damages for replacement manure; and (4) the district court erred in including as damages the cost of applying the fertilizer.

"As a general rule, the party seeking damages bears the burden of proving them; if the record is uncertain and speculative as to whether a party has sustained damages, the factfinder must deny recovery." *Data Docs., Inc. v. Pottawattamie Cty.*, 604 N.W.2d 611, 616 (Iowa 2000). "But if the uncertainty is only in the amount of damages, a fact finder may allow recovery provided there is a reasonable basis in the evidence from which the fact finder can infer or approximate the damages." *Miller v. Rohling*, 720 N.W.2d 562, 572 (Iowa 2006) (citation omitted).

As to JTTR's first claim, JTTR notes there was a dispute between the parties as to whether Thompson's field was ready to take the manure at the time the manure pit needed to be emptied in 2013: Thompson's son—who farms with Thompson—testified the field was ready for manure application as required by the MEA; a JTTR employee testified Thompson had not completed the harvest of his 146 acres. By granting an award that included damages for 2013, and denying JTTR's post-trial motion that raised this issue, the district court implicitly found the testimony of Thompson reliable. We defer to that finding. *See Weaver*, 608 N.W.2d at 804.

JTTR next argues the district court erred in awarding damages for JTTR's failure to provide manure in the fall of 2015, because Thompson planted soybeans in 2016 and soybeans do not require fertilizer. There is no evidence

Thompson actually purchased replacement fertilizer or manure, that his crops (soybeans) suffered from the lack of fertilizer, or that Thompson had less profits from soybeans than he would have earned from growing corn had he had the fertilizer to support the growth of corn. *See Midland Mut. Life Ins. Co. v. Mercy Clinics, Inc.*, 579 N.W.2d 823, 830 (Iowa 1998) ("Typically, the nonbreaching party's recovery is limited to 'the loss he has actually suffered by reason of the breach.'" (citation omitted)). Because it was Thompson's burden to prove he was damaged, *see Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 641 (Iowa 1996) ("The party seeking damages has the burden to prove them."), and he has failed to demonstrate damages, we reverse the district court's award of damages for the 2015 to 2016 crop year. We therefore reduce the award by $26,523.93 to a total of $43,909.99.

Next, JTTR argues the district court erred in using the cost of commercial fertilizer as the measure of damages for replacement manure. The record does not support that JTTR offered any alternative measurement to replace that of commercial fertilizer; JTTR simply claims Thompson failed to prove the cost of replacement manure. But Thompson had an agronomist testify regarding his method of pricing manure based on "what a co-op or a fertilizer company would pay for the fertilizer."[9] The agronomist did so by breaking the price down "to cost

---

[9] Specifically, the agronomist testified: "Q. Okay. As part of your job, have you in the past calculated a value of manure based upon the value of commercial fertilizer. A. Yes." On cross-examination, the agronomist conceded he did not make any effort to establish some kind of market price for manure instead of using commercial fertilizer costs, noting that would be "tough to do." The nutrient management specialist similarly testified there was no way that she knew of to calculate the cost differential between manure and commercial fertilizer. But the agronomist also admitted "[i]t's safe to say that a lot of times" buying manure would cost much less than buying commercial fertilizer.

per unit of nutrients." The agronomist testified the trial exhibits relied upon by Thompson in calculating his damages modeled the agronomist's method of calculating the value the manure based on commercial fertilizer. A second party—a nutrient management specialist who writes manure plans and nutrient management plans—testified she examined the exhibits relied upon by Thompson and verified the accuracy of their numbers. She further testified she found this method to be an accurate way of valuing the manure. We find this testimony provides a reasonable basis for the district court's reliance on the damages as calculated by Thompson.

Finally, JTTR argues the district court erred in including as damages the cost of applying the fertilizer, when the MEA explicitly imposes this cost on Thompson. Thompson does not dispute the MEA imposes this cost on him; he argues the cost of application was not included in his calculations. Further, Thompson notes JTTR failed to argue the exclusion of or value of application costs at trial. JTTR appears to be relying upon the language in Thompson's trial exhibit—which states it reflects the "value of fertilizer by gallon applied"—to support that Thompson's calculations include the expense of actual application. But Thompson's agronomist testified the numbers he used represented wholesale costs. We find the evidence sufficient to support the district court's order as to the years prior to 2015 and, therefore, affirm as modified for a damages judgment in the amount of $43,909.99.

### E. Appellate Attorney Fees

"In general, attorney fees will be awarded to a prevailing party only if pursuant to statute or written contractual provision." *Lara v. Thomas*, 512

N.W.2d 777, 786 (Iowa 1994). The MEA contains an indemnification agreement providing "the parties hereby agree to indemnify and hold harmless each other for all costs related to or generated as a result of any action, duties or failure to act . . . with such indemnification to include . . . attorney's fees and any other related costs." Thompson claims fees in the amount of $4068. Given the results of this appeal, we determine Thompson is entitled to an award of appellate attorney fees in the amount of $3000.

## IV.    Conclusion

We affirm the district court except for its award of damages for the 2015 to 2016 crop year. We grant a portion of Thompson's request for appellate attorney fees. We remand for entry of judgment consistent with this opinion. Costs are assessed to JTTR.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**