# IN THE COURT OF APPEALS OF IOWA

No. 19-2006
Filed December 15, 2021

**MARK BENSON d/b/a BENSON BORDER MATERIALS,**
        Plaintiff-Appellant/Cross-Appellee,

**vs.**

**BOYLE BUILT ENTERPRISES, L.L.C., and ANDREW BOYLE,**
        Defendants-Appellees/Cross-Appellants.
_____

        Appeal from the Iowa District Court for Van Buren County, Crystal S. Cronk, Judge.

        The parties to a contract for the sale of a railroad tie removal business appeal and cross-appeal from a district court ruling. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**

        Bryan J. Goldsmith of Gaumer, Emanuel, Carpenter & Goldsmith, P.C., Ottumwa, for appellant.

        Kevin J. Caster of Shuttleworth & Ingersoll, P.C., Cedar Rapids, for appellees.

        Heard by May, P.J., and Greer and Schumacher, JJ.

**SCHUMACHER, Judge.**

The parties, Mark Benson, doing business as Benson Border Materials (hereinafter "Benson"), and Boyle Built Enterprises, L.L.C. (hereinafter "Boyle Built") owned by Amy Boyle (hereinafter "Amy") and Andrew Boyle (hereinafter "Andrew"), entered into an agreement for the sale of Benson's railroad-tie-removal business. Benson was to transfer the physical assets of the business, a contract with Omaha Track, and provide consulting services for two years. In exchange, Boyle Built agreed to pay a purchase price for the physical assets and ten percent of the revenues earned under the Omaha Track contract for Benson's consulting services.

Benson brought suit against Boyle Built, alleging Boyle Built breached the agreement by failing to pay sums owed under the contract and made other equitable claims.[1] Boyle Built argued Benson breached the agreement, relieving the obligation to pay the contract balance, and also brought other counterclaims. A bench trial was held over a period of three days in July 2019. The district court denied Benson's breach-of-contract claim and dismissed Benson's equitable claims. The district court granted Boyle Built's breach-of-contract counterclaim and denied its other counterclaims. The court made additional rulings on the sale of various equipment. Benson appeals and Boyle Built cross-appeals.

---

[1] Benson also brought claims against Andrew Boyle individually but dismissed the claims, seeking judgment against Boyle Built only.

**I. Relevant Facts**

**A. The Railroad Tie Removal Business**

The parties to this appeal are engaged in the railroad-tie-removal business. When a section of track or "hitch" needs to be replaced, the railroad company deploys crews of railroad employees or "gangs" to separate the ties from the rails. The discarded ties are left beside the track as the gangs work their way down the rails. The clean-up and removal of the ties from the railroad track is subcontracted through a contract service company retained by the railroad.

Picking up and removing the ties from the railroad requires the use of specialized equipment and "high-rail grapple trucks."[2] Replacement parts for the grapple trucks are specialized and can be difficult to acquire. Grapple truck operators must possess knowledge of the railroad's safety regulations and are required to complete safety training courses.

**B. The Parties' Respective Businesses**

In 1997, Benson began his railroad-tie-removal business, Benson Border. Around 2002, Benson Border began doing railroad-tie-removal jobs for a contract service company, Omaha Track. By 2009, Omaha Track was awarding consistent contracts to Benson Border, including all clean-up for the Union Pacific Railroad. During this time, Benson continued to expand his business, successfully completing projects across the Midwest, New Mexico, and Colorado. In 2014, Benson had gross income from Omaha Track in excess of one million dollars. By

---

[2] High-rail grapple trucks are large commercial trucks able to be driven on railroads. The platform bed of the trucks is equipped with a grapple crane which is operated to lift and move the railroad ties.

2015, Benson had a fleet of five grapple trucks and had five to eight full-time employees. Around this same time, Benson was considering slowing down his business and spending more time working on his farming operation in northern Minnesota.

Andrew and Amy Boyle founded Boyle Built around 2011. The business began as a residential tree removal service but over time grew to include storm debris clean-up and other right-of-way contracting. Amy handled the bookkeeping and Andrew secured contracts and worked in the field. Around 2013 or 2014, Andrew sought to expand the business further and began exploring the railroad-tie-removal business. Around this time, he was introduced to Benson. In 2014, Andrew accompanied Benson on the railroad to learn more about Benson's business. Soon after, Boyle Built entered the railroad-tie-removal business and began securing contracts for various individual projects.[3] Eventually, the idea of Boyle Built purchasing Benson was introduced.

### C.    The Sale of Benson to Boyle Built

In May or June 2015, Benson, Andrew, and Andrew's business associate, Brian Newman, met in Pella, Iowa to discuss the sale of Benson's business to Boyle Built.[4] After the meeting, Andrew drafted a letter of intent based on the terms discussed. The parties acknowledge that the contract was a "rough draft." Some of the contract's terms were later modified orally by the parties.

---

[3] Boyle Built was able to secure a few short-term contracts for single projects.
[4] Boyle Built could not review the financial records prior to the sale of the business because of Benson's accountant being unresponsive to Boyle Built's requests and an ongoing audit.

On July 23, Benson agreed with the terms and signed the letter. On July 25, the Omaha Track contract was signed over to Boyle Built and the parties began performance of their obligations under the agreement.

The parties stipulated and the district court found the letter of intent served as a valid written contract between the parties. The contract includes terms of the assets to be purchased, the purchase price, payment of the purchase price, and employee matters. However, other critical portions of the contract were left blank or were vague. The portions of the contract most relevant to this appeal follow. Additional terms are discussed where necessary.

> Purchase of the Benson Border Materials' Omaha Track Business:
> At closing, Buyer or an affiliate will purchase Benson Border Materials' business relationship with Omaha Track and the assets used by Benson Border Materials and selected by Buyer to conduct that business (the "Proposed Transaction"). The Proposed Transaction will include Buyer's acquisition of:
> (i) 2013 Kenworth, VIN 1NKDX4EX4DJ354337; ($200,000)
> (ii) 2000 Kenworth, VIN 1NKDLBEX9YS958708; ($160,000)
> (iii) 1998 Mack, VIN 1M2AD62C9WW005864; ($110,000)
> (iv) 1995 International, VIN 1HTGCADR1SH658910; ($90,000)
> (v) Tie carts ($10,000) each serco 8500 ($25,000) poclian drive $12,500?
> (vi) All of the intangible assets associated with Benson Border Materials' business relationship with Omaha Track including but not limited to any contracts that with Omaha Track that may be assigned to Buyers, Seller's brand names, customer lists, licenses, trade secrets, know how, etc.; and
> (vii) All of Seller's accounts receivable associated with the Omaha Track.
> Buyer will not assume any of Seller's liabilities.
>
> Consideration:
> The purchase price (the "Purchase Price") would be equal to:
> (a) $627500 (the "Closing Purchase Price") in cash, plus (limited to parts or additional equipment)

(b)     Assuming (i) Mark Benson is not in breach of his Consulting Services Obligations; and (ii) Buyer's monthly revenues with Omaha Track arising from the Proposed Transaction (measured for each of the 24 months following closing) equal or exceed [$ ], Buyer shall pay Seller [10% of such monthly revenues] up to an aggregate of 2 years retainage (the "Earn-Out" Payment).

Payment Of Purchase Price:
        The Closing Purchase Price, less the amount held in escrow (as provided by paragraph 9 below), will be paid in cash at Closing. The Earn-Out Payment will be paid each month for the 24 months following Closing.
        [ . . . ]

Employee Matters:
        [ . . . ]
        Mark Benson shall use his best efforts to provide Buyer with at least [ ] hours/week of consulting and advisory services for the 24 months following closing which consulting and advisory services shall assist Buyer with retaining and expanding business with Omaha Track (the "Consulting Services"). The Earn Out Payment shall be deemed to be compensation for the Consulting Services.
        [ . . . ]
Escrow: not currently in effect
        [ . . . ]
        **Alternately, instead of an escrow account, Buyer will lease all equipment from seller for 4 months, and 100% of the lease price will go toward the purchase price of $627,000.  (Will be approximately $5,500 per truck per month for the grapple trucks).  If for some unforeseen reason the buyer forfeits after the 4 months, seller retains all lease payments.

For every project billed under the Omaha Track contract, Omaha Track would withhold ten percent of the invoiced amount until after the job was complete. The withholding was described as "retainage."  Under the parties' consulting agreement, Benson was to receive this amount for two years in exchange for his consulting services.

### D.     Boyle Built after the Sale of the Business

Business went well for Boyle Built during the first six months of the contract period.   Benson's grapple trucks were mobilized to Boyle Built's first project, Benson went out to assist and the project succeeded.   During this time, Benson was out in the field operating a grapple truck for roughly forty days.[5]   After Boyle Built's first two projects, Benson returned to his farm in northern Minnesota; he never returned to the field to assist on projects.   Benson remained available only by telephone to offer advice and answer Boyle Built's questions.

After the initial six months, Boyle Built's business and the relationship between Boyle Built and Benson started to sour.   From January to March 2016, Boyle Built worked the "Gila Bend" project in Yuma, Arizona.   It was the largest project Boyle Built had undertaken.   The project was fraught with mechanical and logistical difficulties.   Amy testified,

> [I]t was extremely stressful, that it seemed like nothing was going right.  It was a really tough schedule, working nights.  It was hot.  It was in Arizona.  We had a lot of breakdowns.  I knew there was a lot of difficulties with coordinating things with the railroad and getting things to work in our favor.

Compounding these difficulties was the concurrent Walsenburg project in Pueblo, Colorado, where Boyle Built was short an operator.   Benson was asked to fill in but declined.

The Gila Bend project ended in contention after Boyle Built incorrectly placed ties on a right-of-way.   The difficulties with the project led Omaha Track and

---

[5] The district court found Boyle Built agreed to pay Benson for his work as an operator at a rate of $300 per day.  The court ordered Boyle Built to pay Benson $12,000 for wages, which is not an issue in this appeal.

Union Pacific to become concerned with Boyle Built's ability to successfully complete projects. After the project, Omaha Track and Union Pacific arranged a meeting with Boyle Built to discuss their relationship going forward. Benson was asked to attend the meeting, but he declined.

The performance of Boyle Built on the Gila Bend project led to a drop in business. The number of contracts Boyle Built could secure steadily decreased over the remaining contract period. In late 2017, Boyle Built lost its railroad-tie-contract with Omaha Track.

## II. Arguments on Appeal

Benson asserts that the district court erred in denying his breach-of-contract claim, arguing substantial evidence does not support the court's finding that he breached the parties' consulting agreement. Benson also objects to the court's rulings on oral agreements between the parties for the sale of miscellaneous equipment. Boyle Built cross-appeals, contending the district court erred in dismissing its counterclaim for "mobilization costs," arguing substantial evidence does not support the court's finding that Benson was not contractually obligated to deliver the grapple trucks to Boyle Built's first project.

## III. Standard of Review

The issues raised on appeal arise out of a breach-of-contract claim. We review a breach-of-contract action for correction of errors at law. *NevadaCare, Inc. v. Dep't of Hum. Servs.*, 783 N.W.2d 459, 465 (Iowa 2010). "The trial court's legal conclusions and application of legal principles are not binding on the appellate court." *Id.* (quotation omitted). However, if district court's findings of fact

are supported by substantial evidence the court is bound and will affirm. *Iowa Mortg. Ctr., L.L.C. v. Baccam*, 841 N.W.2d 107, 110 (Iowa 2013).

## IV.    Consulting Agreement

### A.    Introduction

The district court found under the consulting agreement Benson had an obligation to use his "best efforts" to assist Boyle Built with "retaining and expanding business with Omaha Track."  The court found Benson's best efforts "require[d] more than telephone contact," and Benson's declination to go to project sites was a substantial breach.  Therefore, the court found Boyle Built was "not required to make further payment for consulting services/'Earn-Out'/retainage" and their "failure to make such payments is not a breach of the contract."[6]

The court found the remaining balance on the asset purchase to be $57,624.[7]  It ruled, "Upon payment of $57,624 by Boyle Built Enterprise to Mark Benson, Benson shall transfer the following vehicles and titles to [Boyle Built], free of any encumbrance: 2013 Kenworth, 1998 Mack, and 1995 International."

### B.    Discussion and Analysis

The contract dictates that payment of retainage to Benson turns on Benson not breaching his "Consulting Services Obligations."  To decide Benson's breach-of-contract claim, the district court was required to determine whether Benson had

---

[6] Retainage under the Omaha Track contract for the two years after the sale of the business totaled $238,998.43.  Retainage was: $68,714.07 in 2015; $145,951.58 in 2016; and $24,332.78 in 2017.  Boyle Built made retainage payments to Benson sporadically as it was released by Omaha Track.  At the time of trial, Boyle Built had paid Benson $96,052.99 in retainage.

[7] This amount was calculated using the $627,500 asset purchase price less the $569,876.26 already paid.  Boyle Built stipulated that it owed $57,624 on the balance of the contract.

fulfilled his obligations entitling him to payment of the retainage. The contract defines "Consulting Services" as "Mark Benson shall use his best efforts to provide . . . consulting and advisory services which [sic] shall assist Buyer with retaining and expanding business with Omaha Track." The relevant provision in the contract contemplates a certain minimum number of hours per week of consulting services Benson is to provide, but the term is left blank on the contract and the parties never set a weekly requirement. The contract does not provide any further explanation of Benson's duties and obligations under the consulting agreement.

Resolution of the issues before it required the district court to interpret the contract and determine the meaning of the words used by the parties. In interpreting a contract, our supreme court has explained,

> The cardinal rule of contract interpretation is to determine what the intent of the parties was at the time they entered into the contract. Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight.

*Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008) (quotation marks and citations omitted). Additionally, whenever reasonable, the parties' manifestations of intent "are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade." *Id.* (citation omitted). Finally, "When the interpretation of a contract depends on the credibility of extrinsic evidence or on a choice among reasonable inferences that can be drawn from the extrinsic evidence, the question of interpretation is determined by the finder of fact." *Id.*

### 1.    Intention of the Parties

In determining the intention of the parties related to Benson's consulting services, the district court found it credible that "the intention was for [Benson] to go to job sites to assist with the operations, assist with railroad crews (flaggers, dispatchers and gangs), and help train Boyle's employees."  In support of its finding, the district court noted Benson's many years of experience working with railroad crews and established relationship with Omaha Track allowed him to get rail time with local crews and complete projects promptly.  Before the sale of the business, Benson and Boyle Built discussed these relationships and agreed the relationships would benefit Boyle Built in taking over the business.  The court characterized Benson's relationships and experience as a valuable intangible asset negotiated by the parties and attributed it to the "trade secrets and know-how" identified in the contract.  Given Benson's obligation to expand and retain the business, the court found it was the parties' intent that Benson would dispense his experience and relationships by going out to projects, assisting with railroad crews, and training Boyle Built's employees.

Benson argues the district court's interpretation is not supported by substantial evidence.  He argues the parties' conduct shows they did not intend for Benson to come out to the field; they intended only for Benson to be available by telephone.  When the interpretation of a contract relies on extrinsic evidence, we are bound by the findings of fact unless they are not supported by substantial evidence.  *See id.*  We find substantial evidence supports the district court's interpretation.

Boyle Built was purchasing more than the physical assets of Benson's business. Benson had established a lucrative contract with Omaha Track and maintained relationships with railroad employees that made his business successful. Before the sale of the business, Andrew accompanied Benson on the railroad, where Benson instructed how to perform maintenance on the grapple trucks and imparted tricks of the trade to Boyle Built, sharing stories about how he had handled local railroad gangs. Andrew testified that when he was purchasing the business's intangible assets, his understanding of the terms "trade secrets" and "know how" included,

> Relationships with the railroad, the ability to fit in with gangs, you know, knowing that we weren't union and that they were union. I believe that he had personal relationships with gangs, that he had buddies out there that were going to treat us better than just subcontractors. I believe that he'd been to a lot of these yards and jobs before and he knew the intricacies of the yards and where to stockpile ties—and that's what he told me.

Benson acknowledged that the parties intended for him to transfer these intangible assets through his consulting services.

During their on-going discussions about the prospect of Boyle Built taking over Benson's business, Andrew recalled that Benson "was enthusiastic that we were going to spawn this relationship. Me and him were going to go, you know, do something really good on the railroad." It was known that Omaha Track was expanding their operations and new opportunities would be presented. Benson knew Boyle Built had other lines of business but Andrew testified that Benson told him "he would be there to help me fill the gaps when I had to step away." During the first six months of the contract period, Benson came out on two of Boyle Built's projects where he operated a grapple truck and engaged the other employees,

teaching them how to perform maintenance and instructing them on where to go for safety training.

The circumstances leading up to and surrounding the execution of the contract indicate the primary purpose of the consulting agreement was to serve as a means for Benson to impart the experience and relationships he developed to Boyle Built. Given the contract's terms obligating Benson to use his best efforts to expand and retain the business, the evidence supports that the parties intended for Benson to use his experience and relations in the field when requested.

We do not determine the parties' conduct after the sale of the business demands an alternative interpretation. Benson argues that because Boyle Built never gave Benson notice that he breached the consulting agreement, the parties' conduct establishes that all that was required of Benson was to be available by phone.

In support of his claim, Benson points to the parties' text messages and the fact "those messages do not contain a single instance of Boyle Built showing dissatisfaction with Benson's consulting work." Benson relies on Boyle Built's continued acknowledgment of retainage because of Benson and his use of Benson as a resource over the contract period.

While no text messages evidence Boyle Built's dissatisfaction with Benson's assistance, a majority of the parties' communications occurred over the phone, and other testimony presented at trial suggests that Boyle Built did not feel Benson was fulfilling his obligations as the parties intended.

Andrew testified that Benson's assistance through the Gila Bend project was a "big eye-opener" for him. He stated that after the project, he told Benson,

"it wasn't working the way that we talked about. I said it wasn't what he told me he was going to do." Amy testified that she had "an ongoing discussion" with Andrew about the adequacy of Benson's consulting services. She stated that while she continued to keep an accounting of the retainage, by July 2017, she felt Benson had not done "the consulting services to earn [the retainage]." When asked why Boyle Built continued to pay retainage up until the last payment, Andrew explained,

> Well, for one I wanted to do what I said I was going to do. I wanted to take the high ground, and I wanted to ultimately work it out with Mark. I wanted to finish the—I wanted to finish this agreement the way that we intended to finish it.

He explained that he continued to call and ask Benson's advice because he wanted to get his money's worth out of the consulting agreement, even if it was just through phone calls.

While the parties' conduct is an important factor in determining the parties' intent, it must be evaluated within the surrounding circumstances. *See* Restatement (Second) of Contracts § 202 cmt. g (Am. Law Inst. 1981) ("Conduct must be weighed in the light of the terms of the agreement and their possible meanings."). The parties' intent as found by the district court and their following conduct as explained and given context at trial are reasonable and consistent. We find the record contains substantial evidence to support the district court's conclusion.

## 2.      Breach of Consulting Agreement

We turn to the district court's conclusion that Benson breached the consulting agreement.  Benson had a contractual duty to use his best efforts to provide consulting services to expand and retain the business with Omaha Track.  Substantial evidence supports the district court's conclusion it was the intention of the parties the consulting services would include going to project sites to assist with operations, assisting with railroad crews, and training Boyle Built's employees.  The parties agree Benson provided satisfactory consulting services during the first six months of the contract period.  The parties disagree as to whether Benson's performance over the rest of the two years constituted a breach.

During the first six months, Andrew testified that Benson "came out right away, did more than he had to do," and Amy testified that Benson was "helpful and present."  Benson went out to Boyle Built's first project on the Minnesota-Iowa border and operated a grapple truck.  He showed Boyle Built employees how to do general maintenance on the trucks and told them where to go for safety and other maintenance training.  He went out to Boyle Built's second project in Colorado to remedy an issue with rail wheels.  He had "[s]ometimes daily. Sometimes weekly" phone calls with employees where he would talk them through fixing various equipment.  He communicated frequently with Boyle Built and advised on how to navigate the organizational structure of Omaha Track.

However, after six months, Benson returned to his farm in northern Minnesota and never returned to the field to assist on projects, only providing his consulting services over the phone.  Andrew explained that after the first six months,

[Benson] he went home and started farming, he was available like everybody testified via phone. And I was hopeful that he was going to get his farming situation under wraps and be able to come back out to the field and help ramp it up again. And then, you know, by the time Gila Bend hit, it waned. It waned, and his interest and ability to help started waning.

Communication between Benson and Boyle Built declined over the contract period. Phone records show the time Benson spent on the phone with Boyle Built steadily decreased over the two years and went from roughly 120 hours the first six months to twenty-five, seventeen, and eight hours over the next six-month periods. Benson acknowledges the decline but attributes it to Boyle Built asking less questions "as people became more familiar with the trucks." Boyle Built attributes the decline to becoming "tired of begging him to come and help."

In its ruling, the district court noted that Benson provided telephonic services over the contract period but found it reasonable that "'best efforts' require more than telephone contact in these circumstances." To support its conclusion, the district court noted that because Benson did not go out to project sites as requested, Boyle Built's business suffered. The court specifically pointed to the Gila Bend project as an example of where Benson's experience and relationships could have facilitated the timely completion of project, and that after the project, Boyle Built experienced a significant decline in business. The court found that Benson's "declination to go to a job site did not assist Boyle 'with retaining and expanding business with Omaha Track' as required under the terms of the contract," and Benson therefore breached the agreement.

In response to the court's finding, Benson argues he could fulfill his obligations through the services he provided over the phone and his failure to

assist in the field when requested was not a breach because his presence was not actually needed or he had a legitimate reason for declining.

The Gila Bend project was a significant turning point in Boyle Built's business and the relationship between Benson and Boyle Built. Benson contends that he cannot be faulted for the difficulties experienced during the project because he offered to assist in the field, but Boyle Built declined. In support of his position, Benson points to a text message exchange between himself and Andrew at the beginning of the Gila Bend project. Andrew texted Benson, "They're saying they're [g]oing to do 7[-]8000 ti[es] a day down there." Benson replies, "Let me know in a couple days if you want me to fly down, to run a truck, until Lance gets back." The record of text messages has no response from Andrew. Benson asserts that this exchange shows he was willing to come out to the field and assist on the Gila Bend project but his offer was declined.

However, other evidence shows that after this initial offer, Benson was asked to assist and he declined. The very next day, on January 5th, Andrew texted Benson and inquired, "Are you getting on the conference call?" Benson replied, "When is it?" Andrew replied, "Over." Newman and Andrew testified that mandatory conference calls were scheduled between Boyle Built, Omaha Track, and Union Pacific and Benson's attendance was requested, but Benson never joined the calls. Benson was asked to attend the meeting with upper management from Union Pacific and Omaha Track, but again, Benson declined, indicating he "was done railroading."

Newman testified that during the Gila Bend project, they were short an operator on the Walsenburg project and the need "was very urgent." He asked

Benson to assist, but Benson texted in response, "I really need to stay home, have been laid up, and have cows about to start calving. Can you get by without me?"[8]

Following the Gila Bend project, Boyle Built continued to seek Benson's assistance. Boyle Built's next project was in June 2016 at the "Proviso" yard. The yard is in the Chicago area and its proximity to the city presented unique challenges, including little space for stockpiling, commuter trains, and pedestrian crossings. Benson was familiar with yard and was asked to assist on the project. During the project, a new operator was hired, but he needed to be trained and no other qualified Boyle Built employee was available. When asked if he would come out to the project and train the new employee, Benson stated that he would be in Texas for his daughter's high-school graduation.

The consulting services Benson did provide during the project over the phone were unsatisfactory. The flag man assigned to Boyle Built was known to Benson and his former employees as particularly difficult to work with. Boyle Built struggled to coordinate rail time and Benson was asked how to handle the issue. Benson recommended contacting the flag man's supervisor but it appears this effort led to more issues between Boyle Built and the railroad crews. It is reasonable to conclude that had Benson been at the project site, he could have provided his consulting services in a more effective manner.

---

[8] Andrew responded the next day, "Weather isn't looking good in Pueblo first part of this week anyway. Ya we can manage I think, just need to get that Walsenburg project up to snuff." Benson argues this shows that Benson's assistance was not actually needed. We disagree, Benson had been asked to come out and he declined. Boyle Built's acceptance of Benson's refusal does not show Benson was fulfilling his obligations.

The issues continued through Boyle Built's next project in North Platte, Nebraska, in late August 2016. One of Boyle Built's operators was unexpectedly called home and Boyle Built needed someone to fill in. Andrew texted Benson, "Mark, in a bind and need someone to run the [2000 Kenworth] . . . [a]ny way you can run that truck?" Benson responded, "I can't think of any way I can. In the middle of harvest. Wish I could, so I could get some rest." On other occasions, Benson provided responses to Boyle Built's inquiries, such as "Come park the trucks," "It ain't gonna work," and "Just give up."

Substantial evidence supports the conclusion Boyle Built sought more assistance by Benson during the contract period. Benson's experience and relationships with local railroad crews and Omaha Track would have proven helpful in addressing the issues faced by Boyle Built during the projects. Andrew testified that "the big thing" he needed from Benson on the Gila Bend project was where to put cars ad that without Benson's assistance he was forced to "put 120, maybe, roughly thousand ties on the ground, which could have went in cars and ultimately ended up into a blowup with the railroad and Omaha Track as to why the cars didn't get placed." The evidence established that without Benson's assistance the business suffered. Union Pacific and Omaha Track sent upper management to discuss their relationship with Boyle Built going forward. Andrew testified that "there was upper management on both sides [Omaha Track and Union Pacific] that got in big trouble over this project." After the project, Boyle Built had "a big red check against us with Omaha Track. We didn't fulfill our obligations, so it was—it was a downward descent for us." Substantial evidence supports the

conclusion Benson's consulting services did not expand and retain business with Omaha Track.

We reject Benson's argument that because replacement operators were eventually found or the projects were eventually completed, he did not breach his consulting obligations. The evidence shows that after the Gila Bend project Boyle Built's business suffered and continued to suffer until the end of the contract period. The number of contracts Boyle Built could secure steadily declined until the end of the year. Boyle Built did not perform any railroad tie removal from January to May 2017. Finally, in September 2017, Boyle Built lost its railroad-tie-contract with Omaha Track.[9]

Substantial evidence supports that under his obligation to use his best efforts to expand and retain the business with Omaha Track the parties intended for Benson to provide more than telephonic services. Accordingly, we affirm the district court's conclusion that Benson breached the terms of the agreement and Boyle Built does not have to pay Benson the remaining retainage pursuant to the consulting agreement.

V.     **Agreements Outside of the Contract**

Benson and Boyle Built made various oral agreements not included in their contract for the sale of miscellaneous equipment. Benson challenges the court's rulings about the sale of this equipment and requests the district court judgment

---

[9] The revenues earned by Boyle Built under the Omaha Track contract reflect the difficulties experienced by the business. In 2015, from August through December, revenue was $687,149.74. In 2016, revenue was $1,459,515.82. In 2017, from January to July, revenue was $243,327.80.

be modified concerning (1) "service trucks," (2) a "piston pump," (3) a "stabilizer leg and cylinder," and (4) "used high-rail gear."

### 1. Service Trucks

The parties dispute the terms of the oral agreement in regard to the purchase/lease of three "service trucks." The district court found sufficient evidence "the terms of the contract were modified to include the sale of the service trucks for $5000 each if Boyle wanted to purchase them. Therefore, Boyle Built is not liable for this payment if they choose not to retain the service trucks." The court also ordered, "[Boyle Built] has 30 days to notify [Benson] if they intend to purchase the service vehicles or return the same to [Benson]. The purchase price shall be $5000 per vehicle and [Benson] shall deliver the vehicle and clear title to defendant upon receipt of payment."

The parties do not dispute they had an agreement in which Boyle could lease the service trucks for one dollar per month and at the end of the two-year contract return the trucks or purchase the service trucks for $5000 each. The issue raised by Benson on appeal is whether their agreement included a term that if Boyle Built does not purchase the service trucks they must be returned in "like-kind or better" condition.

Benson contends the like-kind requirement was always a part of the deal. In explaining the agreement, he testified that "I would like them returned in good working order at the end of it, at the end of the contract, or they could keep them and we could figure the value of $5000 each." Boyle Built argues the service trucks were "a throw-in" to the deal and "I for dang sure didn't agree to return trucks with three, four hundred thousand mile in better or same condition as I found them.

Every mile after that cost me money." On September 14, 2017, Andrew texted Benson a picture of two of the service trucks and asked, "Do you want these back for farm trucks?" Benson replied, "If they are same condition or better," and "I have a surplus of vehicles that need repairs."

Benson seeks a modification of the district court judgment concerning the service trucks to include a requirement that the trucks be returned to Benson in good working condition if Boyle Built does not purchase the trucks.

"In order to be binding, an agreement must be definite and certain as to its terms to enable the court to give it an exact meaning." *Tri–States Inv. Co. v. Henryson*, 179 N.W.2d 362, 363 (Iowa 1970) (citation omitted). Upon our review we do not find the record establishes the parties' agreement included a "like-kind" requirement. We decline to disrupt the district court's order in this respect.

### 2. Piston Pump–Poclian Drive Unit

The parties also dispute the sale of a "piston pump," which is a component of a "poclian drive unit."[10] The contract lists a "poclian drive" unit with a listed value of "$12,500 ?". At the time the contract was entered into the parties agreed Boyle Built would receive a poclian drive unit. However, the parties dispute whether the poclian drive unit in the contract included the piston pump.

Boyle Built argues the poclian drive unit listed in the contract represented parts Benson already had on hand and certain difficult to acquire parts that Benson had already pre-paid for, which included the piston pump. Benson contends the pump was not included in the contract because he did not know the value of the

---

[10] The drive unit provides hydraulic power off of the truck's transmission and is used to move the trucks on the rails down the tracks.

pump at the time, and the parties made a separate agreement outside the contract price for the part.

At trial the invoice for the part was submitted into evidence. The invoice is dated June 18, 2015, shortly before the contract was entered into. The part shipped July 20 and was delivered to a workshop where Boyle Built eventually picked it up. The district court found the invoice undercut Benson's claim and found it credible that the pump was to be included in the contract price.

We find substantial evidence supports to support the district court's conclusion that the contract included the piston pump.

### 3.     Stabilizer Leg and Cylinder

During the course of the contract, Boyle Built needed a new "stabilizer leg and cylinder."[11]  Benson acquired the part from another individual in the railroad tie removal business, Bob Whitner, and one of Boyle Built's employee's picked it up.

Benson asserts that Boyle Built agreed to pay him $1700 for the part, while Boyle Built contends he only agreed to "replace it or buy Bob a new one."  Andrew texted Benson a picture of a replacement part and stated, "Got this leg for whitner." However, Andrew testified that the replacement leg went missing around the time Benson repossessed one of the service trucks and he "feel[s] like the dadgum leg was in the service truck that [Benson] took."[12]

---

[11] A stabilizer leg "is a component on the loader that stabilizes the truck so it doesn't tip over."

[12] In June 2018, Benson repossessed the 2000 Kenworth truck and one of the service trucks after not receiving payment for what he believed he was owed.  The service truck contained railroad equipment and other personal property belonging to Boyle Built.

The district court found that Boyle Built agreed to replace the stabilizer leg and noted that Boyle believed it was in the vehicle Benson repossessed. The court ordered Benson to return the stabilizer leg to Boyle. Benson argues the court's ruling about the stabilizer leg and cylinder is unclear and it should enter judgment in his favor for $1700. We disagree. We find substantial evidence in the record to support the district court's conclusion regarding the stabilizer leg.

### 4. Used High-rail Gear

Boyle Built received a set of railroad wheels and attachment parts which the parties call "used high-rail gear." The parties do not dispute the value of the equipment is $5000. Boyle Built argues the used gear was part of the equipment identified in the contract but agreed that if the district court found otherwise, he would pay Benson for the equipment.

The district court's order states, "At trial, Boyle agreed to make payment of following amounts: Used high rail gear: $5000 if the Court determined this wasn't included in the equipment listed. This Court finds the gear was not included in the contract." However, the $5000 amount is not included in the court's ultimate calculation of what is remaining due on the contract. The apparent inconsistency was raised in Benson's Rule 1.904 motion, but the court did not address it.

Benson argues the court's ruling about the used high-rail gear is unclear and it should enter judgment in his favor for $5000. We agree and modify the judgment in this regard.

## VI. Cross Appeal

Boyle Built cross-appeals from the district court's finding that Benson did not have to deliver the grapple trucks to Boyle Built's first project and Boyle Built

is not entitled to a $12,000 credit toward the purchase price of the contract for the expenses paid to mobilize the trucks.

When the contract was entered into, the grapple trucks purchased from Benson were scattered across the country and needed to be "mobilized" to Boyle Built's first project along the Minnesota-Iowa boarder. Boyle Built claims that they spent $12,033 to move the equipment to the project. The costs included: "labor; miscellaneous costs for repairs to trucks that were not drivable; hotel fees; and fuel expenses."

One of the grapple trucks was located at the Denver Airport and Boyle Built paid to fly an employee out to pick it up and drive it back to the project. However, the truck had a cracked rim that needed to be repaired. Another grapple truck, the 2000 Kenworth, was also in Colorado. While the truck was being mobilized to the project site, the truck experienced engine failure making it inoperable.[13] The other grapple trucks were closer to the project site, at various locations in the Midwest and were mobilized successfully. While the 2000 Kenworth truck was being repaired, Boyle Built leased another grapple truck from Omaha Track to ensure they had the capacity to finish the project.

The contract does not state who must bear the cost of relocating the equipment. The district court found, "The contract is silent on the location of the vehicles for delivery from Benson to Boyle. As such, the Court finds that Benson

---

[13] The repairs cost $23,083.30, and Benson agreed to credit half the cost towards the purchase price of the truck, which the parties do not dispute. It does not appear this cost was in Amy's accounting of the $12,033 mobilization costs.

did not have a contractual obligation to deliver the vehicles to the initial Boyle job site."

Andrew testified that Benson "was willing to cover whatever costs were his" and "he agreed that I'd take possession of the trucks when they got delivered, and then I ended up delivering the trucks to myself to—to some extent." Amy acknowledged that the mobilization costs were something to be worked out between Boyle Built and Benson. She acknowledged that she did not include an accounting of the cost in the payment records sent to Benson until an email sent July 11, 2017.[14] Benson responded to the email, "The start-up charge of 12000.00 is not acceptable, as I believe I paid wages and fuel to Iowa jobsite."

As the contract is silent on the matter and the record does not contain evidence establishing Benson's obligation, we find no error in the district court's conclusion.

## VII. Conclusion

Finding no err in the district court's determination on the contract breach, we affirm. We find under the oral amendments, we reverse the district court ruling that fails to award Benson compensation for the used high-rail gear. We remand for modification of the judgment by $5000.00 in Benson's favor.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED ON APPEAL; AFFIRMED ON CROSS-APPEAL**.

---

[14] Two statements of payments and amounts due sent by Amy to Benson were submitted at trial. The dates of which are August 13, 2016, and July 6, 2017. The statements do not include a $12,000 mobilization cost.