# IN THE COURT OF APPEALS OF IOWA

No. 23-0649
Filed August 21, 2024

**ANTHONY J. MANATT,**
  Plaintiff-Appellee,

**vs.**

**BRADFORD J. MANATT,**
  Defendant-Appellant.

_____

Appeal from the Iowa District Court for Delaware County, Monica Zrinyi
Ackley, Judge.

A stockholder appeals the grant of summary judgment on another
stockholder's breach-of-contract claim. **AFFIRMED.**

Mark E. Weinhardt, Jason R. Smith, Taylor N. Sellers (until withdrawal) and
David N. Fautsch of The Weinhardt Law Firm, Des Moines, for appellant.

David L. Charles and Matthew D. Callanan of Belin McCormick, P.C., Des
Moines, for appellee.

Heard en banc, but decided by Tabor, C.J., Greer, J., and Bower, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206
(2024).

**TABOR, Chief Judge.**

Bradford Manatt (Brad) appeals an order finding that he must offer his shares in Dyersville Ready Mix (DRM) to his brother Anthony (Tony) under a mandatory buy-sell agreement. This appeal marks the second time this litigation has come before our court. Two years ago, Tony appealed after the district court entered a directed verdict for Brad. We reversed and remanded for a new trial. *Manatt v. Manatt*, No. 21-0319, 2022 WL 1232226, at *12 (Iowa Ct. App. Apr. 27, 2022). On remand, the district court granted Tony's motion for summary judgment. In this appeal, Brad argues there are genuine issues of material fact about the enforceability of the buy-sell agreement. He also argues his affirmative defenses require determination by a jury. Because the record reveals no jury question on the enforceability of the buy-sell agreement and Brad did not preserve error on affirmative defenses, we affirm.

## I. Facts and Prior Proceedings

For orientation, we start with this background, set out in the previous appeal, which is undisputed on the current record:

> The Manatt family owns several construction-related companies. In the late 1980s, control over the Manatt family businesses (collectively Manaco) transferred from the first generation of Manatt owners, "M1," to the second generation of owners, "M2." Brad and Tony are part of M2. They owned the Manaco businesses with their cousins—Michael Manatt, John Manatt, and Tim Manatt—the remaining members of M2.
> In 1999, Tony proposed a plan for the M2s to purchase shares in Dyersville Ready Mix (DRM). The M2s agreed. Consistent with the plan, each of the five M2s purchased 150 shares of DRM. Also consistent with the plan, five valued employees were offered the opportunity to purchase some shares of DRM with the M2s. All five accepted and bought fifty shares each. Altogether, the ten buyers— all five of the M2s and five employees—bought 50% of DRM's shares.

In connection with this purchase, these ten shareholders executed two written agreements. One of the agreements—entitled "Bardco Trust Voting Trust Agreement" (Trust Agreement)—established a trust. Through this agreement, the shareholders assigned their shares of DRM to two trustees. They also authorized the trustees to vote all of the shares with one voice. The trust would also serve administrative functions, such as distributing dividends. But the trust would not last forever. Rather, according to the Trust Agreement, the trust would terminate (1) after twenty-five years passed, (2) if all the shares were sold to a third-party, or (3) if two of the ten shareholders died or became incapacitated. Also, the trust's "termination date" would accelerate if DRM merged or consolidated.

*Id.* at *1 (footnotes omitted). The trust agreement included this termination clause:

Upon the death, disability or resignation of any one of the trustees named herein, the remaining two trustees shall continue to serve as trustees, but in the event that two or more of the trustees named herein have resigned, died or are disabled, then this Voting Trust Agreement shall be terminated.

The original trustees were Tony and Tim; their successors in case of death, incapacity, or resignation were Brad and his cousin, John. In the first appeal, our court explained another document, signed at the same time as the trust:

The second agreement was entitled "Mandatory Buy-Sell Agreement" (MBS). The ten shareholders were all parties to the MBS, as was the trust. Tony and Tim signed the MBS both in their individual capacities as shareholders and also as trustees of the trust. The other eight shareholders signed only in their individual capacities.

Although the MBS and the Trust Agreement were both signed on the same day by the same ten signers, the MBS included none of the termination language found in the Trust Agreement.

*Id.* at *2.

In 2003, the M2 generation started passing the family companies to their children, the M3 generation. That year, Tim retired, and Brad replaced him as a trustee; Brad also took over as Manaco president. Michael died in 2005. John

retired in 2006. The first employee shareholder, Ron Lehne, retired in 2007. Calvin Paup followed suit in 2008.

A critical event occurred five years later: DRM merged with Apex Concrete, L.L.C. Then, in 2014, Brad stepped down as Manaco president. In the first appeal, our court found the exact date of Brad's retirement was unclear. *Id.*

In 2018, Tony requested that Brad tender his DRM stock for sale to Tony under the mandatory buy-sell agreement and date its valuation to Brad's retirement, which Tony alleged happened in 2016. Brad responded that the 2013 Apex merger terminated the trust agreement, so the buy-sell agreement was also unenforceable.

In May 2018, Tony filed this action seeking declaratory judgment to force Brad to sell his shares. In August 2019, Tony moved for partial summary judgment. He asked the court to enter judgment finding that the mandatory buy-sell agreement was triggered by Brad's retirement in 2014. Brad resisted, contending that there remained a factual dispute whether the buy-sell agreement dissolved with the voting trust. The district court denied Tony's motion, finding "a substantial and good faith controversy over whether the contract is vague, indefinite, or uncertain as to whether it remained enforceable at the time of Brad's retirement."

After a delay caused by the global coronavirus pandemic, Tony renewed his request for summary judgment. But the court did not rule on that motion. Instead, it held a three-day jury trial in February 2021. Tony offered witnesses and exhibits in support of his declaratory judgment action. Brad presented no defense case but cross-examined Tony's witnesses and offered exhibits.

Following submission of the evidence, Brad moved for a directed verdict, which the district court granted. In the first appeal, we described the reasoning behind that ruling: "the court apparently accepted Brad's contention that there had been a 'failure of condition precedent' because the trust 'had been terminated by its terms' as a result of 'the retirement/death of more than three of its members and [DRM's] merger with Apex Concrete in 2013.'" *Id.* at *4.

Tony appealed the dismissal of his claims. Our court held that we could not conclude *as a matter of law* that the continued existence of the trust was a condition precedent to enforcement of the mandatory buy-sell agreement against Brad. *Id.* at *8. Because the district court erred by granting a directed verdict on that basis, we reversed and remanded for a new trial.[1] *Id.* at *12.

On remand, Tony again moved for summary judgment, asking the court to establish that (1) the buy-sell agreement was triggered by Brad's retirement in December 2014; (2) that the agreement obligated Brad to offer his shares of stock in DRM for sale at that time, (3) that the audited financial statements to be used to value his shares are those for the fiscal year ending in June 2014, and (4) that the method for valuing Brad's shares was set out in the buy-sell agreement. Two days before the retrial, the court granted Tony summary judgment.

The district court found the voting trust "terminated . . . as early as 2006" when trustee John retired. Applying the analysis from our decision, the district court reversed its directed-verdict determination by finding the existence of the

---

[1] The district court also found that Tony lacked standing to pursue his claim. Our court reversed that finding. *Manatt*, 2022 WL 1232226, at *12. And Brad does not contest Tony's standing in this appeal.

voting trust was not a condition precedent for enforcing the buy-sell agreement. It found they "are two separate and distinct documents, that are in place for two wholly different functions." Relying on testimony and records from Manaco's accountant, it found the buy-sell agreement was followed at the death or retirements of three M2 family members—Tim, Mike, and John—as well as two employee shareholders—Lehne and Paup. The court found:

> These facts show a course of dealing over the period of time of ownership of DRM, and how the parties performed under the buy-sell when a shareholder departed from the Manatt companies. Brad offers no evidence to the contrary making this an undisputed fact.
> As previously stated, there was never any testimony that DRM ever exercised this first right of refusal on the shares of departing members in 2003, 2005, 2006, or when the employee shareholders departed later, as there was no voting trust to exercise any rights. The buy sell agreement was implemented, the valuation and formula were followed and the stock passed to Tony and Brad. The M2s were slowly but surely passing the reins to the M3s. A reasonable jury can infer that Tony would be the last man standing. He is the youngest of the M2s. He is the reason the deal was struck with DRM in the first place. Lastly, he is still involved and an active member of Manaco. DRM should rightfully, and following the buy sell agreement, be 100% Tony's now that Brad is retired and no longer an employee.

The district court further found that Brad retired as of December 31, 2014, a date announced in a company newsletter, and as a matter of law he had to offer his shares of stock to Tony "as the last man standing" in the trust. Finally, the court ordered that the parties use the manner and formula at paragraph 1.3 of the buy-sell agreement to determine the value of Brad's shares. The remaining issue was the valuation of the stock. The district court declined to make a declaratory ruling on "the exact date of the valuation of Brad's stock" because the buy-sell agreement used the phrase "leaving the employment" of Manaco rather than "retirement," so

there remained "a valid issue to argue that Brad would reap benefits from his ownership until October 2016," when he left the company for good.

After the partial summary judgment ruling, the parties stipulated to a purchase price of $8,425,421 for Brad's shares less deductions of $1,937,916 for non-tax distributions "to create a final judgment" that would allow an appeal. Once the court approved the stipulation, Brad appealed.

## II.  Scope and Standards of Review

"The standard of review for district court rulings on summary judgment is for correction of errors of law." *Kunde v. Est. of Bowman*, 920 N.W.2d 803, 806 (Iowa 2018). The moving party is entitled to summary judgment as a matter of law when there is no genuine issue as to any material fact. Iowa R. Civ. P. 1.981(3). Summary judgment is proper when the only issue is the legal consequence of undisputed facts. *See Peak v. Adams*, 799 N.W.2d 535, 542 (Iowa 2011). "In determining whether a grant of summary judgment was appropriate, we examine the record in the light most favorable to the nonmoving party, drawing all legitimate inferences that may be drawn from the evidence in his or her favor." *Homan v. Branstad*, 887 N.W.2d 153, 163–64 (Iowa 2016).

So too, we review the district court's contract interpretation for correction of legal error. *Colwell v. MCNA Ins. Co.*, 960 N.W.2d 675, 676–77 (Iowa 2021). The goal of contract interpretation is to determine parties' intent when they formed the contract. *Pillsbury Co., Inc. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008) (explaining that contract language is the most important evidence of intent).

**III. Analysis**

In challenging summary judgment, Brad raises two issues.[2]  First, he contends the district court erred in finding as matter of law that the buy-sell agreement was enforceable despite termination of the voting trust.  He argues enforceability of the buy-sell agreement was a disputed issue of material fact precluding summary judgment.  Second, he argues that even if the buy-sell agreement survived expiration of the voting trust, his affirmative defenses generated issues of material fact.  We address those arguments in turn.

**A. Enforceability of the buy-sell agreement**

**1. Impact of our prior decision**

From the top, Brad invokes our reversal of the directed verdict in the first appeal.[3]  In his words: "As the Iowa Court of Appeals has previously determined, disputed issues of fact regarding the intent of the parties and the enforceability of the DRM buy-sell preclude judgment as a matter of law on either party's behalf."  But he overstates our holding.  In the first appeal, we found that the language of buy-sell agreement did not compel a conclusion that it could not function after expiration of the trust, just that it might function differently.[4]  *Manatt*, 2022 WL 1232226, at *7.  Thus, we said termination of the voting trust did not preclude

---

[2] In his appellee's brief, Tony contends we should disregard Brad's statement of facts because he does not consistently cite the record.  We decline to do so.  While it is important that briefs comply with the appellate rules, here the appellant's brief contains enough citations to assist in our review.

[3] At oral arguments, Brad's counsel clarified that he was not arguing that the law-of-the-case doctrine or the mandate rule barred the district court from granting summary judgment.  Instead, his position was that summary judgment was not appropriate on the law and the facts.

[4] In a colorful illustration of this point, then Judge May wrote, "Although dogs do best with four legs, some three-legged dogs can still frolic."  *Id.* at *7 n.11.

enforcement of the buy-sell agreement *as a matter of law*. *Id.* at \*8. We did not say that the district court could not decide as a matter of law that termination of the voting trust had no impact on the enforceability of the buy-sell agreement. *See Jones v. Glenwood Golf Corp.*, 956 N.W.2d 138, 143 (Iowa 2021) (noting that motion for summary judgment was denied on legal grounds "not because of a genuine issue of material fact"). In fact, we were careful to not entertain Tony's argument that the district court should have granted his motion for summary judgment based on "the entire trial record" because that issue was not preserved on appeal from the directed verdict. *Manatt*, 2022 WL 1232226, at \*12. But it is the question before us now.[5]

### 2. Interpreting the contracts

Brad contends that we can best answer that question by examining "the language and interdependent structure of the DRM trust and its buy-sell agreement." Likewise, Tony focuses on the wording of the two contracts. So our initial step is to review the key portions of those documents.

Turning first to the voting trust agreement, we are most concerned with the termination triggers. That agreement states that it "shall be effective and remain in force" until "twenty-five (25) years following the date" of signing or "the death or incapacity of two" out of the ten signatories. Later paragraphs provide for termination on the effective date of a "consolidation or merger" or when "two or

---

[5] In this appeal, Brad argues in a footnote that Tony's motion for summary judgment was "procedurally flawed" because he was seeking a declaratory judgment. We reject that argument. Our supreme court has affirmed the grant of summary judgment in declaratory judgment actions. *See, e.g.*, *EMC Ins. Grp., Inc. v. Shepard*, 960 N.W.2d 661, 664 (Iowa 2021).

more of the trustees" die or resign from the company. As Tony points out, the voting trust agreement does not cross-reference termination of the mandatory buy-sell agreement.

In contrast to the trust agreement, the buy-sell agreement does not have a termination provision. The closest it comes is the prefatory paragraph: "WHEREAS, the parties believe it to be in the best interests of the shareholders and the trust to insure continuity of harmonious management by restricting the transfer of the capital stock of the corporation *during the lives of the shareholders*." (Emphasis added.)[6]

And to that end, the terms of the agreement restrict how departing shareholders can dispose of their stock.

Paragraph 1.1 states that DRM Voting Trust members

shall not sell, assign, pledge or otherwise transfer or encumber in any manner of by any means whatever any interest in all or part of the capital stock of the corporation now owned or hereafter acquired by them without having first obtained the consent of or offered it to the corporation in accordance with the conditions of this agreement, or to remaining shareholders in the event the corporation does not exercise its right of purchase.

Paragraph 1.3 of the buy-sell agreement says, "Any stockholder leaving the employment of the Manatt companies or a related company of itself or of MANACO Corp and its related companies, shall offer his stock for sale under the restrictions

---

[6] In the first appeal, we acknowledged Brad's caution that "we should not put too much weight on a preliminary recital that does not appear elsewhere in the contract." *Manatt*, 2022 WL 1232226, at *7 (citing *Fisher Controls Int'l, L.L.C. v. Pharmacia Corp.*, No. 07-0003, 2008 WL 373636, at *5 (Iowa Ct. App. Feb. 13, 2008)). But we did find that the preliminary recital shed light on how the buy-sell was intended to function and weighed against the idea that it terminated with the trust agreement. *Id.*

of this agreement." That paragraph also sets out a formula for determining the value of the stock.

Paragraph 1.7 sets out what happens when a shareholder wants to sell their shares, noting that the voting trust has "the first right to purchase the stock of any shareholder" with the purchase price to be determined under the formula in the agreement. If the voting trust does not buy the stock, then paragraph 1.8 comes into play. Under that provision, if the voting trust does not exercise its first right to purchase the stock, then the remaining shareholders, in proportion to their ownership of the stock, shall have the right to purchase the shares.[7]

Having reviewed the pertinent passages from the two documents, we next consider how they interact with one another. *See U.S. Bank, Nat'l Ass'n v. Bittner*, 986 N.W.2d 840, 848 (Iowa 2023) ("[I]nstruments relating to the same transaction which are contemporaneously executed should be construed together." (Citation omitted)). Brad maintains that the voting trust and the buy-sell agreements are "symbiotically joined at the hip"—leading to his interpretation that the buy-sell agreement was void and unenforceable after the voting trust terminated. Tony counters that the buy-sell agreement is "unambiguous as to duration" and is not limited by the termination triggers in the *separate* voting trust agreement.

---

[7] In oral argument, Brad's counsel pointed to these paragraphs as evidence of the linkage between the mandatory buy-sell agreement and the voting trust. But as we noted in the first appeal, those provisions "gave the trust *opportunities* to purchase shares from shareholders in certain circumstances." *Manatt*, 2022 WL 1232226, at *6. They gave "relatively limited support for the idea that the trust's existence was a condition precedent—an essential prerequisite—to Brad's obligation to sell his shares upon retirement." *Id.*

Although we were not deciding Tony's summary judgment motion in the first appeal, we foreshadowed support for his position in reversing the directed verdict. *Manatt*, 2022 WL 1232226, at \*8.  We emphasized that the trust agreement was "a separate document" and explored the interplay of the two agreements:

> This separation might imply the two documents were meant to function separately.  Also, the Trust Agreement—which, again, was executed the same day as the [mandatory buy-sell]—included explicit language that guaranteed the trust would expire upon the occurrence of one or more specified events, e.g. the passage of twenty-five years.  A rational juror could reason that if the signatories had intended the [mandatory buy-sell] to have the same durational limits as the trust, they would have expressly stated those durational limits in the [mandatory buy-sell's] text.  In any event, the signatories surely would *not* have included a recital that signaled their intent for the MBS [to] "restrict[ ] the transfer of the capital stock of the corporation *during the lives of the shareholders.*"  (Emphasis added.) Rather—a rational juror could infer—the signatories would have included a recital of their intention that the [mandatory buy-sell] restrict stock transfers only during *the trust's* lifetime.

*Id.*

We now amplify those points in reviewing the grant of summary judgment to Tony.  We conclude that not only could a rational juror infer that if the signatories meant to tie the obligations in the mandatory buy-sell agreement to the existence of the trust, they would have expressed that intent in the documents, but that no rational juror could infer otherwise.  In other words, the language of the buy-sell agreement is susceptible to only one reasonable interpretation—it was enforceable during the lives of the shareholders regardless of the expiration of the trust.  We reach this conclusion by examining both the language of these agreements and the parties' relationships and course of dealings.  *See McNeal v. Wapello Cnty.*, 985 N.W.2d 484, 490 (Iowa 2023) (considering contract as a

whole—along with pertinent extrinsic evidence—to determine whether it is ambiguous and what it means).

Based on the entire record—including the trial transcript and the documents submitted in support of and in resistance to the renewed motion for summary judgment—the district court decided that termination of the voting trust had no impact on Brad's obligation to offer his shares of stock to Tony.[8]  Viewing the undisputed facts, the court found that obligation reflected not only in the buy-sell agreement but through a "course of dealing over the period of time of ownership of DRM, and how parties performed under the buy sell when a shareholder[] departed from the Manatt companies."  The court emphasized that "Brad offers no evidence to the contrary making this an undisputed fact."  We find no error in the court's decision.  *See Peak*, 799 N.W.2d at 542 (reiterating that party resisting summary judgment "must set forth specific facts showing that a genuine factual issue exists" (citation omitted)).

In affirming the district court, we do not ignore Brad's critique that the judge "usurped the jury's role and substituted its own judgment" by assuming the "buy-sell's continued existence and enforceability, while ignoring evidence—such as the purpose and terms of the DRM voting trust and Tony's failure to ever previously enforce the buy-sell."  But we disagree that the district court ignored evidence of the purpose for the trust and buy-sell agreements or the company's record of enforcement.

---

[8] Brad and Tony agree the voting trust had terminated by the time Brad retired. The district court found it was as "early as 2005" when Michael died or as late as 2013 when DRM merged with Apex.

In fact, the purpose for those documents was a rare point of agreement between the brothers in this litigation. Tony offered evidence that the aim of buy-sell agreements was to follow a "last man standing" approach where the last shareholder in the original trust would end up with all the stock. Ron Nielsen, the family's long-time accountant, testified this was a common phrase used by the Manatt companies. Tony testified the family companies used voting trusts and mandatory buy-sell agreements to keep control within the family. And in his deposition, Brad agreed that the mandatory buy-sell was designed to ensure that full ownership consolidated with the last person who was a party to the agreement.

As for the history of enforcement, accountant Nielsen produced a timeline and table of the shareholder departures and the values assigned to the shares when they were purchased by Tony and Brad. When asked how he set the valuations, Nielsen testified he used the buy-sell agreement's formula under paragraph 1.8. From that and other evidence in the record, the district court determined that the company followed the buy-sell agreement after shareholder deaths or retirements in 2003, 2005, and 2006. In later years, there was no trust to exercise any rights because it had terminated. The "stock passed to Tony and Brad" as contemplated in the agreement. We discern no error in the district court's characterization of the undisputed facts.[9] The district court properly granted partial summary judgment on this record.

---

[9] We recognize Brad's assertion that the participants in the agreement did not "slavishly follow the mandatory buy-sell agreement," and instead were "always doing side deals and variations." But Brad's testimony on that point was self-serving and did not match the facts produced by Nielsen.

## B. Brad's affirmative defenses

Having decided that the district court was correct in deciding as a matter of law that the buy-sell agreement survived the termination of the voting trust, we turn to Brad's second issue. In that back-up claim, Brad insists he presented enough evidence to create jury questions on three affirmative defenses: (1) Did "Tony waive[] his right to demand Brad's shares in the successor corporation—particularly at a 2014 valuation"? (2) Did "Tony's unclean hands prevent him from claiming a right to Brad's shares—particularly at a 2014 valuation"? and (3) Was it "impossible for Brad to tender the DRM stock back to DRM or other trust members after the termination of the voting trust and attendant conversion of DRM stock into surviving corporate stock"?[10]

Brad raised these affirmative defenses in his resistance to the renewed motion for summary judgment. His attorney argued them at the summary-judgment hearing. But the district court did not analyze the affirmative defenses in its decision granting summary judgment. The court's only mention of the defenses came on the first page of the ruling when the court was summarizing the parties' positions: "[Brad] argues the motion is improper for the reasons that the Court of Appeals indicated there is a material fact issue and that [Brad] should be permitted to have his defenses presented to the jury." Because the court did not rule on these claims, Tony maintains that Brad failed to preserve error on his affirmative defenses by not moving to amend or enlarge the court's findings.

---

[10] Tony argues that Brad misrepresents the effect of the Apex merger. In his appellee's brief he contends: "Although Brad treats the 'surviving corporation' and 'DRM' as two different entities, the articles of merger define the surviving corporation as DRM." The record supports Tony's contention.

Appellate review rests on the fundamental doctrine that issues must not only be raised in the district court, but also decided there. *Konchar v. Pins*, 989 N.W.2d 150, 160 (Iowa 2023). In his appellant's brief, Brad acknowledged he did not receive a ruling on his claim that a jury should decide his affirmative defenses: "The district court's error was not that it erroneously overruled these defenses on the way to summary judgment, but that it never addressed them at all." From there, he urged that reversal and remand was required "to give him a day in court on these issues." Brad did some cleanup in his reply brief, asserting, "[T]he district court *ruled on* Brad's affirmative defenses by considering and rejecting them even though it failed to *substantively* address them." Brad relies on *Lamasters v. State*, in which our supreme court rejected error-preservation challenges in a postconviction-relief appeal. 821 N.W.2d 856, 862−66 (Iowa 2012).

But unlike *Lamasters*, the district court did not "specifically note" the substance of Brad's affirmative defenses in its ruling. *Id.* at 864. On a general level, the court was aware that Brad had affirmative defenses that he wanted to present to a jury. But the court did not "litigate" those claims in its summary judgment ruling. *See Meier v. Senecaut,* 641 N.W.2d 532, 540 (Iowa 2002). To preserve error, Brad needed to call the district court's attention to its oversight under Iowa Rule of Civil Procedure 904(2). *Id.* at 537 ("When a district court fails to rule on an issue properly raised by a party, the party who raised the issue must file a motion requesting a ruling in order to preserve error for appeal."). Because Brad did not do so here, the issue of his affirmative defenses is not properly before us and cannot be a ground for reversing the grant of summary judgment.

### C. Determining the Valuation Date and Formula

After remand, with a renewed motion for summary judgment before it, the district court found, based on Brad's own testimony, that he retired on December 31, 2014. We agree that retirement date is an undisputed fact. But it is not Brad's retirement date that triggered his obligation to offer his shares to Tony. As the district court noted, the buy-sell agreement uses the phrase "leaving the employment" of the Manatt companies, rather than the term "retirement." And the court found there was a "valid issue to argue that Brad would reap benefits from his ownership until October 2016," the last date that Brad received "W-2 income" from the company.[11]

After the court declined to issue summary judgment on the question of when Brad left his employment, the parties entered a stipulation to resolve the pending issues and allow the parties to appeal. The order approving the stipulation described two pending issues: (1) the date on which Brad left the employment of the Manatt companies and was therefore obligated to offer his shares for sale to Tony and (2) the method to calculate Brad's disgorgement of distributions he received from DRM after he needed to offer his stock for sale. The court then entered a declaratory judgment for Tony, setting the purchase price for Brad's shares. Lastly, the order approved the stipulation explaining that should we affirm the grant of summary judgment, the district court would retain jurisdiction on remand to enforce the declaratory rulings. Given the terms of the stipulation

---

[11] Brad testified that after his retirement at the end of 2014 he continued to do work for the Manatt organization, maintaining an office at the Newton facility and visiting the Apex operation.

approved by the district court, there is nothing for us to decide on the question of stock valuation.

**AFFIRMED.**